UNITED STATES of America,

v.

Kevin McCORMACK, Defendant.

Criminal No. 97–10168–NG.

United States District Court,
D. Massachusetts.

Nov. 25, 1998.

Brian T. O'Connor, U.S. Attorney's Office, Boston, MA, for U.S.

Martin Boudreau, North Quincy, MA, John J. McGlone, III, Gianrusso, Norton & McGlone, PC, Quincy, MA, Kevin J. McCormack, Salem, NH, for Kevin J. McCormack.

### AMENDED MEMORANDUM AND ORDER

GERTNER, District Judge.

This case raises the question of how far Congress has gone, and, under the Constitution, may go, to federalize crime—here, the crime of bribing a Malden Police Officer to ignore certain state offenses.

Kevin McCormack ("McCormack") has been indicted for giving cash payments of $4,000 to a Malden police officer, Detective David Jordan ("Jordan"), in violation of 18 U.S.C. § 666(a)(2). While the Malden Police department receives federal funds, the alleged bribe had nothing whatever to do with those funds, or indeed, with any cognizable federal program or purpose. To the extent

the Government alleges any quid pro quo, it suggests that the money was intended to keep the Malden Police from investigating McCormack for various state offenses.

McCormack now moves to dismiss the indictment on two grounds, one statutory and one constitutional. First, he claims that the conduct alleged in the indictment, and further amplified by the affidavit of an Assistant United States Attorney, is not an offense within the scope of § 666(a). Second, he claims that if the conduct with which he is charged does fit within the scope of § 666(a), then § 666 is unconstitutional as applied since it goes beyond the limits of federal jurisdiction.[1]

After due consideration, I agree. I find that the conduct allegedly engaged in by the Defendant does not meet the statutory requirements of § 666(a). Moreover, even if it did, I find the statute is unconstitutional as applied to the facts of this case. Accordingly, I **GRANT** the Motion To Dismiss.

### I. THE FEDERAL STATUTE

The statute under which McCormack has been charged makes it a federal crime, under certain "circumstances" (later defined in § 666(b)), to

corruptly give[ ], offer[ ], or agree[ ] to give anything of value to any person, with intent to influence or reward an agent of an organization or of a State [or] local government ... in connection with any business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $5,000 or more.

18 U.S.C. § 666(a)(2). The circumstances outlined in (b) are that the local government or agency must have received "benefits in excess of $10,000 under a Federal program." 18 U.S.C. § 666(b).

Thus, the statute covers the traditional bases one might find in any bribery statute: 1) the giving of a thing of value; 2) to an agent of defined entities; 3) with a "corrupt"

---

1. The Defendant did not explicitly make a constitutional argument, although he cites to language in *Salinas v. United States*, 522 U.S. 52, 118 S.Ct. 469, 475, 139 L.Ed.2d 352 (1997), which implies

one. The Government understood that implication, making the argument that § 666 is constitutional both under the Spending Clause and the 10th Amendment.

intent. But it goes beyond the traditional to include language apparently limiting its coverage to certain *federal* offenses: The entity whose agent received the bribe must have received over $10,000 in "benefits.... under a Federal program," and the bribe itself must be given "in connection with any business, transaction, or series of transactions of such organization, government or agency involving anything of value of $5,000 or more."

There is no dispute in this case that the first prong of the limiting language is met: The Malden Police Department, like scores of departments across the country, receives over $10,000 in federal funds. Money is given to the Malden Police Department through a Community Revitalization Grant ($33,500), two Community Policing Grants ($25,000 and $26,409), a D.A.R.E. Grant ($20,000), a Domestic Violence Grant ($114,500), and a Housing Authority Grant ($19,000). The core issue concerns the second: the meaning of the "in connection with" requirement, how the $5,000 value is measured, whether an intangible quid pro quo suffices, and the extent to which the provision obligates the Government to link the bribe in question to certain kinds of *federal* transactions.

The Government challenges the defendant's substantive position. It would interpret § 666, which is captioned, "Theft or bribery concerning programs receiving Federal funds," not as a statute requiring any specific link to federal funds or federal programs but rather as a general federal anti-corruption statute: Once a local entity meets the $10,000 a year limit—and considerable numbers will [2]—any and all bribes, about any aspect of the entity's business, so long as they reach a certain level (involving a benefit of over $5,000) may be prosecuted as federal offenses. It does not matter if federal funds were threatened, either directly or indirectly,

or if a federal program was implicated in any way. The federal link is essential only to determine which programs and entities fall under federal protection; once there, any significant corruption can be federally prosecuted.

Before I address the Government's arguments, I am obliged to address a threshold question. The Government challenges the authority of this Court to consider these issues at all on a motion to dismiss an indictment. The Court, the Government rightly suggests, has limited authority to consider the appropriateness of an indictment returned by a duly constituted Grand Jury.

I will first outline the facts, as they have been presented by the pleadings, then the threshold question, the Court's authority to consider this Motion To Dismiss at all, and finally, the merits of the defendant's federal jurisdictional claim.

## II. FACTS

The following facts derive both from the face of the indictment as well as an affidavit filed by Brien T. O'Connor, an Assistant United States Attorney in the District of Massachusetts.[3] They are, for the purposes of this motion, uncontested.

McCormack made four separate cash payments of $1,000 to Jordan between November 1996 and March 1997.

Interactions between McCormack and Jordan date back to 1985. Over the past thirteen years, Jordan has investigated McCormack for various alleged criminal acts, including possible cocaine trafficking. All such investigations were purely state law enforcement enterprises.

McCormack was then charged with attempted murder in Massachusetts Superior

---

2. Every state and thousands of other political entities and subdivisions receive federal funds, many at the ten thousand dollar limit. *See* George D. Brown, *The Stealth Statute—Corruption, The Spending Power and the Rise of § 666*, 73 NOTRE DAME L. REV. 247, 275 (January, 1998).

3. On March 30, 1998, this Court held a motion hearing on the questions raised by the Defendant's Motion To Dismiss. In response to the

question of how it planned to satisfy the second jurisdictional element, a "thing of value," the Government argued a position which appeared to ignore this element. Considering the serious repercussions of such a position, on July 29, 1998, I ordered the Government to submit an attorney's affidavit stating further its theory regarding this element. On August 17, 1998, the Government produced the affidavit Assistant United States Attorney Brien T. O'Connor.

Court as a result of a stabbing incident in Malden on July 28, 1996. The victim was sprayed in the face with mace and stabbed four times; he survived and identified McCormack as his attacker. A warrant was issued and Jordan was one of the officers assigned to find him. McCormack was difficult to find, and during a two week search, Jordan actively investigated his whereabouts. He went to bars frequented by McCormack, questioned McCormack's close friends and associates, and searched the home of a woman friend. As Jordan later testified in a voir dire examination in the state court prosecution, at some point during the search for McCormack, a message, ostensibly from McCormack, was delivered to Jordan: "If Jordan is looking for me, tell him I'm smelling the palm trees."

McCormack finally turned himself in on August 13, 1996, and was released on bail on August 16, 1996, from Malden District Court. The terms of his release included an order to stay out of Malden entirely. On September 20, 1996, McCormack was indicted in Superior Court. He was released again on September 30, 1996, with modified bail conditions. Due to the relocation of the alleged victim out of Malden, McCormack was permitted to work in Malden, but he still had to maintain his 11:00 p.m. curfew, and was ordered to stay away from establishments serving alcohol, except when he was working. He had a job described as "cleaning hoods and doing duct work in restaurants."

In the afternoon of October 10, 1996, Jordan saw McCormack sitting in a Malden bar, apparently not working. Based on his understanding of the new release conditions, Jordan notified the Malden District Court and obtained a warrant for McCormack's arrest. McCormack again turned himself in, but no violation of his bail conditions was found (although he was again instructed to stay out of all drinking establishments when he was not working).

Approximately one month later, McCormack made the first of four payments of $1,000 to Jordan, handing Jordan an envelope of cash that he claimed he had found in the street. McCormack gave Jordan $1,000 in cash again in December, January, and March, tossing the cash into Jordan's car or handing it to him hidden in a cup.

On none of these occasions did McCormack ask Jordan for anything in exchange for the money. Although Jordan attempted to ask McCormack about the payments several times, McCormack would not specifically discuss them or their purpose. All that the Government can offer on this score is Jordan's testimony that he "believe[s]" that McCormack was a cocaine dealer and appears to think that the payments were intended to prevent Jordan from "casing" McCormack and observing him dealing cocaine. The O'Connor affidavit reports that McCormack had boasted to another Malden Police Officer, "before the detectives were always watching me, now they just stay away from me . . . that's funny ha?"

## III. *DISCUSSION*

### A. *Issues Cognizable on a Motion to Dismiss*

The Government challenges any inquiry into a facially valid warrant, citing *United States v. Calandra*, 414 U.S. 338, 344–45, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974) ("Thus, an indictment valid on its face is not subject to challenge on the ground that the grand jury acted on the basis of inadequate or incompetent evidence"); *United States v. Maceo*, 873 F.2d 1, 3 (1st Cir.1989) (finding that a court should not inquire into the sufficiency of the evidence before the indicting grand jury).

■ As a general matter, the Government is correct. An indictment is sufficient if it (a) contains the elements of the offense charged, (b) fairly informs the defendant of the charges against him, and (c) enables him to plead an acquittal or conviction to bar future prosecutions for the same offense. *Hamling v. United States*, 418 U.S. 87, 117, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974); *United States v. Barker Steel*, 985 F.2d 1123, 1126 (1st Cir. 1993); *see also United States v. Agostino*, 132 F.3d 1183, 1191 (7th Cir.1997).[4]

---

**4.** This rule has been analogized to Fed.R.Civ.P. 12(b)(6), with its liberal "notice pleading" stan-

dard. *See e.g., United States v. Apple*, 927 F.Supp. 1119, 1121 (N.D.Ind.1996); *United*

The rationale for the rule is simple: Motions testing the evidence before a grand jury would invariably result in prolonged mini-trials which may effectively replicate the trial itself. Moreover, a subsequent conviction after trial by petit jury arguably corrects any grand jury errors. If a jury found the evidence sufficient to convict beyond a reasonable doubt, surely there was probable cause to indict. *See Costello v. United States*, 350 U.S. 359, 363, 76 S.Ct. 406, 100 L.Ed. 397 (1956).

■ Under these rules, it would normally be sufficient for the Government to do what it has done here: track the language of the statute in the indictment and include enough facts to put the defendant on notice of which conduct is challenged.

■ But there are plainly exceptions to the general rule—threshold issues, as to which the facts are uncontested, which comprise questions of law and not fact. *See e.g., United States v. Korn*, 557 F.2d 1089, 1090 (5th Cir.1977) (holding that the propriety of granting a motion to dismiss an indictment by pretrial motion depends largely upon whether it involves an infirmity of law or determination of facts); *United States v. Caceres–Prado*, 601 F.Supp. 468, 470 (D.P.R. 1984) (motion to dismiss raises question of law rather than fact, would be properly considered). Examples of such threshold issues include double jeopardy questions,[5] statute of limitations questions, and, as here, questions of jurisdiction. Significantly, threshold questions appropriately heard on motions to dismiss an indictment have also included motions addressing jurisdictional questions under § 666. *See United States v. LaHue*, 998 F.Supp. 1182, 1184 (D.Kan.1998) (indictment alleging a § 666 violation dismissed because the program did not meet the $10,000 standard); *United States v. Frega*, 933 F.Supp. 1536 (S.D.Cal.1996) (indictment alleging § 666 violation dismissed, the court finding that the facts alleged, bribery of California Superior Court judges and an attorney, were not covered by § 666 because they lacked a federal connection.) *See also United States v. Stewart*, 727 F.Supp. 1068, 1072 (N.D.Tex., 1989)(government supplier from which goods were alleged to have been stolen, was not "organization" receiving "benefits" in excess of $10,000 in any one year pursuant to "federal program," for purposes of 18 U.S.C. § 666; motion to dismiss granted for lack of subject matter jurisdiction).

The analysis in *United States v. Craft*, 105 F.3d 1123 (6th Cir.1997), is particularly instructive. In *Craft*, the Sixth Circuit affirmed the district court's dismissal of an indictment on statute of limitations grounds. *Id.* at 1129. The court cited to Rule 12(b) of the Federal Rules of Criminal Procedure, as a rule that permits pretrial consideration of any defense that "is capable of determination without the trial of the general issue."[6] *See Id.* at 1126. Within this category, the court held, are questions of law, rather than questions of fact. *Id.* In such a case, there is no concern about usurping the jury's function. The underlying facts are uncontested; the issues are for the judge to determine, not the jury. *See id.*

Likewise in *United States v. Nippon*, 109 F.3d 1 (1st Cir.1997), the First Circuit considered the question of whether the domestic antitrust laws apply to a Japanese Company. There was no discussion as to whether it was appropriate for the Court to do so, or whether considering the issue somehow ran afoul of the rules limiting challenges to grand jury indictments. Moreover, this was the case even though in *Nippon*, the jurisdictional

---

*States v. Mongelli*, 794 F.Supp. 529, 530 (S.D.N.Y., 1992).

**5.** *See United States v. Smith*, 866 F.2d 1092, 1096 n. 3 (9th Cir.1989) (courts may consider on a motion to dismiss an indictment "former jeopardy, former conviction, former acquittal, statute of limitations, immunity [and] lack of jurisdiction.")

**6.** Indeed, the court suggests that Rule 12 was written to encourage the making of such motions prior to trial. *See Craft*, 105 F.3d at 1126 (citing Notes of Advisory Committee to the 1975 Amendments to Fed.R.Crim.P. 12, advising district courts to defer rulings on pretrial motions "only for good cause."); *see also United States v. Levin*, 973 F.2d 463, 465–70 (6th Cir.1992); *United States v. Jones*, 542 F.2d 661, 664–65 (6th Cir. 1976) (citing Rule 12 and accompanying Advisory Notes to support decision of district court to decide motion to dismiss indictment because it raised legal questions).

question the court considered—the extraterritorial jurisdiction of American antitrust laws—was related to an element of the offense that the jury was to consider—the impact of the claimed violation on interstate commerce.[7]

█ In the instant case, the Defendant is not challenging the facial validity of the indictment, or the nature of the grand jury proceedings due to juror bias, prosecutorial misconduct or some other flaw in the process. Nor is the challenge related to the adequacy of the evidence before the grand jury. No mini trial is implicated; the facts are undisputed. *See Craft*, 105 F.3d at 1126 (distinguishing motions to dismiss which raise questions of law, from those denied in *Costello*, 350 U.S. 359 and *Calandra*, 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 which dealt with the validity of the evidence presented before the grand jury proceedings).

Rather, the defendant argues that there will be no evidence on an element of the offense which is essential to § 666's definition of the offense as well as to the requirement of federal jurisdiction: That the alleged bribe was "in connection with any business ... of such organization [any organization receiving over $10,000 in federal funds] ... involving anything of value of $5,000 or more." 18 U.S.C. § 666(a)(2). Like the statute of limitations issue in *Craft*, or the issue of extraterritorial jurisdiction in *Nippon*, the jurisdictional questions raised here are threshold legal questions which the Court may resolve in advance of trial.

Indeed, reviewing legal questions before jeopardy has attached has another salutary effect, which may well have been implicit in Rule 12. Consideration at this stage permits either side to appeal. In contrast, obligating the court to consider such issues on a Rule 29 motion would foreclose a government ap-

peal, if the trial court ruled for the defendant. *See* Fed.R.Crim.P. 29.

### B. *Statutory Interpretation*

The plain language of the statute comprises three elements: a) the defendant intended to receive some identifiable benefit, a quid pro quo; b) that the benefit which the briber receives in exchange "involves" a value of $5,000 or more; and c) that the benefit was "in connection with any business, transaction, or series of transactions" of the entity involved.

Significant questions are raised in this case with respect to each prong. The Defendant was alleged to have bribed a Malden Police Officer, Detective Jordan, for a benefit which, at its most charitable, is intangible, namely turning a blind eye to certain of McCormack's state offenses. Is this the kind of benefit—intangible—that prong (a) contemplates at all?[8] In addition, given the nature of the benefit, and the fact that it "costs" the briber only $4,000, prong (b), requiring value over $5,000, may also be problematic. Finally, to what degree does the "in connection with" requirement of prong (c) oblige the Government to prove that the benefit sought was related to the covered entity's federal business? Put otherwise, does § 666 give federal authorities a blank check to prosecute ostensibly significant acts of corruption involving the Malden Police Department just because the department receives a certain level of federal funds?

1. *What the defendant intended to receive in exchange for the cash payments; are intangible benefits enough?*

As the Government acknowledges, and Jordan testified, McCormack never actually told Jordan the reasons for his cash pay-

---

7. The district court and the First Circuit considered the legal question based only on the facts alleged in the indictment; the First Circuit then declined to dismiss and outlined a standard—that activities committed abroad which have a substantial and intended effect within the United States, may form the basis for domestic criminal prosecution—which the trial court included in the jury instructions. *See Nippon*, 109 F.3d at 2 n. 2.

8. The Defendant suggests that there is hardly any credible evidence to show what the $4,000 represented. That may well be so, but it is a trial issue. For the purpose of this motion, I am assuming that the Government can make its proof.

ments. The Government has only circumstantial evidence for McCormack's intent. McCormack's bribes, they claim, were intended to influence Jordan so he (a) would not investigate McCormack or arrest him for violating any condition of his bail while the charges of assault with intent to kill and assault and battery with a dangerous weapon were pending in state court; (b) would not investigate or arrest him for committing any criminal offense, including cocaine trafficking; '(c) would influence other Malden detectives and officers not to investigate or arrest McCormack; and, (d) would provide McCormack with law enforcement information when he sought it.

 The term "anything of value" has been construed to embrace intangible as well as tangible items. *See United States v. Marmolejo*, 89 F.3d 1185, 1191–92 (5th Cir.1996), *aff'd on other grounds sub nom, Salinas v. United States*, 522 U.S. 52, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997) [9] (holding that the plain meaning of the statute compels conclusion that the term "anything of value" includes transactions involving intangible items); *United States v. Mongelli*, 794 F.Supp. 529, 530 (S.D.N.Y.1992) (same). Courts have found that intangible items such as conjugal visits, special access to licenses and avoiding criminal fines, all qualify as "anything" under the language of the statute. *See Marmolejo*, 89 F.3d at 1191–92 (visits); *United States v. Apple*, 927 F.Supp. 1119, 1121 (N.D.Ind.1996) (criminal fines); *Mongelli*, 794 F.Supp. at 530 (access to licences). Therefore, seeking favors from the police, as McCormack is alleged to have done here, would also qualify.

## 2. *From what perspective is the value of favors measured?*

 The statute is ambiguous on the question of how to measure value under § 666(a) and from what perspective. *See e.g. Frega*,

933 F.Supp. at 1541 (finding ambiguity in calculating the transaction value). This is especially the case where, as here, the benefit is intangible, and there is no connection between the benefit allegedly received by the briber and federal funds.

In cases involving bribes to secure specific federal grants, or in connection with specific federal funds, the analysis is straightforward. *See Frega*, 933 F.Supp. at 1541 ("[I]f § 666 is used to prosecute non-federal employees who corruptly administer federal funds, even if federal funds are not directly threatened, there is only one measure of value: the value of funds corruptly transacted."). *See also United States v. Valentine*, 63 F.3d 459, 461–62 (6th Cir.1995)(transactions were $8,363 misappropriated from copying fees and $7,000 of lost wages when employee labor was misappropriated for personal use); *United States v. Wyncoop*, 11 F.3d 119, 120 (9th Cir.1993)(transaction was $65,000 in federal student loans); *United States v. Simas*, 937 F.2d 459, 463 (9th Cir.1991)(transaction was stair cleaning project worth $5,790); *United States v. Westmoreland*, 841 F.2d 572, 575 (5th Cir.1988)(transactions were purchases of goods worth, $14,482.92).

Where the benefit is intangible, one measure could well be the value to the alleged briber. In *United States v. Marmolejo, supra* for example, payments were made to officials of a county sheriff's department in exchange for allowing a federal prisoner housed at a county jail to have conjugal visits. 89 F.3d at 1188. The payments amounted to $6,000 per month plus $1,000 for each visit. *See id.* at 1191. The court looked at the estimate of value the same way an appraiser would value an asset—how much a person in the market would be willing to pay. *See id.* at 1194; *Mongelli*, 794 F.Supp. at 531.[10] The best measure was what the de-

---

9. The *Marmolejo* case involved two defendants—Marmolejo, the Sheriff, and Salinas, a principal deputy. Although both were indicted and tried together, the Supreme Court case only addressed Salinas' convictions. *See Salinas*, 118 S.Ct. at 472–73.

10. In *Marmolejo* and *Mongelli*, the courts provide the following approaches for estimating the "value": (a) the amount of the bribe as an indi-

cation of the market value of the advantage; (b) direct evidence which may establish the actual value of the item to the defendants; or (c) the dollar amount of gross business or profit obtainable by one having "things" similar to those sought to be obtained by the bribe. *See id. See also Frega*, 933 F.Supp. at 1541 (where the court conceived of three ways the cases at issue could be valued: (1) the amount in controversy; (2) the

fendant was willing to pay for them. This approach, however, does not help the Government; McCormack allegedly paid only $4,000 for having the state officials look aside at a number of state offenses.

The Government has another approach to establish the value of the favors to the briber—what McCormack would have lost in wages if his bail were revoked, combined with the value of being able to continue to live with his fiancee and daughter during the months before his trial. This projected amount, the Government suggests, should trump the small amount McCormack actually paid. The problem is that this measure is entirely speculative on this record.[11]

The Government also suggests that I should consider the value of the benefit from the perspective of the Police Department. Because Jordan and the other officers were paid salaries of over $5,000 throughout the time that McCormack was allegedly attempting to influence and corrupt their responses to his actions, the financial interests of the Police Department were somehow substantially affected by the bribe. If this is the measure, then § 666 would cut a very wide swath indeed—all police officers are paid more than $5,000. Section 666, by this reasoning, would apply to efforts to bribe any police officer, anywhere in the country, for whatever amount.

Finally, in a particularly novel theory, the Government looks to the value to the public of insuring that police functions are not corrupted—that McCormack meets his bail conditions and stays out of bars drinking alcohol when a charge of brutally attempting to kill a patron of a bar was pending against him. Here again, the value is not quantifiable; the theory is speculative.

■ Where, as here, the language of the statute is ambiguous, I am obliged to look to the legislative history to determine whether the statute was meant to apply to the situa-

tion at bar. *See United States v. Foley,* 73 F.3d 484, 489 (2nd Cir.1996) (citing *Dowling v. United States,* 473 U.S. 207, 213, 105 S.Ct. 3127, 87 L.Ed.2d 152 (1985)); *Frega,* 933 F.Supp. at 1541. The legislative history on the issue of value only suggests that what Congress wished to do is to criminalize "significant act of . . . bribery involving federal monies. . . ." S.Rep. No. 225, 98th Cong., 2d Sess., at 369 (1984), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3510. The statute was to be confined to "substantial" acts of bribery, *Mongelli,* 794 F.Supp. at 530, involving "real money" and therefore posing a "real threat" to the integrity of federal funds. *Apple,* 927 F.Supp. at 1125. Without that requirement, as one of the courts noted, the law could make it a federal crime to offer $20 to a local traffic cop in order to avoid a $50 ticket. *Id.*

The Government's theory here does not do much better than the $20 bribe spoof. If the Government were correct in its approach to this case, so long as that local traffic cop made over $5,000 in salary, the public greatly valued motorists who comply with the law, and the briber valued avoiding a ticket, a $20 bribe for a $50 ticket would be prosecuted in federal court. Nothing in the language of the statute or its legislative history suggests that § 666 was intended to reach this far.

More serious problems, however, lie ahead.

### 3. *Must the benefit have some connection with the covered entity's federal business?*

The Government argues that the instant prosecution fits within the required elements of § 666 even though it cannot demonstrate any nexus between the offense—act of bribery—and the federal funds or programs that provide the justification for federal jurisdiction under § 666(b). Section 666, it notes, refers broadly to "any transaction."

ultimate settlement value or verdict; (3) the value of the case to the lawyer defendant).

**11.** The Government bases this argument on the fact that when McCormack turned himself in to authorities on September 30, 1996, he stated on the Pretrial Intake/Indigency Report that he was earning $2,000 monthly in his job as an assistant

manager of a baseball card shop. There is no further representation of McCormack's income on the record and further statements by McCormack's counsel at that day's bail hearing suggest that McCormack's job was actually cleaning hoods and ducts in restaurants and bars.

It is important to put the Government's case in context. One can envision a set of facts along a continuum, all of which fit within § 666's "any transaction" language: On the one end, there is bribery involving federal funds, where the Government would be required to trace the route of federal monies from Congress to the local agency and out again as a result of the charged offense. Next, one can envision bribes that may not be traced to particular federal funds, because the funds were commingled with nonfederal funds, but which will affect federal programming to the degree that it undermines the financial integrity of the identified administering agency. Finally, at the far end, the instant case, are bribes that have nothing whatever to do with federal funds or a federal program, but involves a program whose funding meets the jurisdictional minimum.

■ Plainly, § 666 is not restricted to category (1). There is no requirement that the Government demonstrate a direct link between the bribery and the federal funds— tracing the route of federal monies from Congress to the local agency and out again as a result of the charged offense. See Apple, 927 F.Supp. at 1124; Westmoreland, 841 F.2d at 576 United States v. Smith, 659 F.Supp. 833, 834 (S.D.Miss.1987). The federal funds may be commingled with non-federal funds. The difficulties of proof involved in tracing the federal money would present too onerous a task and create results inconsistent with the obvious breadth of § 666. See Smith, 659 F.Supp. at 835 (after analyzing the legislative history, the Court found "[s]ection 666 was designed to fill a gap which the difficulty of tracing federal monies caused" such that interpreting the section to require tracing bribes to the specific federal program would undermine Congress' goal of broadening its scope.)

Category (2) has been adopted by the Second Circuit. See United States v. Foley, 73 F.3d 484 (2nd Cir.1996). In Foley, the court held that the conduct at issue must at least affect the financial interests of the protected organization, even if it does not affect the federal funds directly. Id. at 492–93. Foley involved the alleged bribing of a member of the Connecticut House of Representatives in exchange for agreeing to influence certain legislation concerning bank mergers and divestitures. See id. at 487, 492–93. While the legislation was important to the banks involved, its impact on the state treasury was less clear. See id. at 492. Moreover, there was no relationship between the funds received by the state and the legislation at issue. See id. The court reversed the conviction, holding that "insofar as the presented evidence in this case reveals, the [voted] exemption affected neither the financial interests of the protected organization nor federal funds directly." Id.

The Second Circuit's approach in Foley is significant. It found that the statute was silent as to the identity of the entity or person to whom the "thing" must have a value of $5,000 which obligated the court to turn to the legislative history. Id. at 489. While the Senate report made note of the breadth of § 666's protection of certain federal funds, this protection extended only to very specific and limited federal interests— "thus not every Federal contract of disbursement of funds would be covered." Id. at 489–90 (Citing S.Rep. No.225, 98th Cong., 2d Sess. 369 (1984), reprinted in 1984 U.S.C.C.A.N. 3510). The court concluded that the value of the "thing" is not assessed with reference to any and every measure; rather, it must be connected, even if only tangentially, to the integrity of the federal program funds. Id. at 490.[12]

Finally, the Fifth Circuit has staked out a position that defines the farthest end of the continuum, category (3). In Marmolejo, it held that the plain language of the statute is clear and specific; it requires that the business, transaction, or transactions involve "anything" of value of at least $5,000 to some person or entity, but not necessarily from the perspective of the person or entity that actually receives federal funds. 89 F.3d at 1193–

---

12. The court in Apple characterizes this as the middle ground between a "corruption focus" and a "funds focus." Apple, 927 F.Supp. at 1124.

94.[13]

The Supreme Court in *Salinas* affirmed the conviction in *Marmolejo.* 118 S.Ct. at 472. In contrast to the finding of the Second Circuit in *Foley,* the Court did not find ambiguity in the phrase, "in connection with any business, transaction . . .," of § 666(a)(1)(B). *See id.* at 473–74. Rather, the Court characterized the language of the statute as "expansive," and "unqualified," concluding that it does not support the interpretation that the bribe itself must involve federal funds or jeopardize the financial integrity of a federal program in order to violate § 666(a).[14] *See id.* at 473. The word "any," which precedes the words "business" or "transaction," undercuts such a narrow construction. *See id.* In the face of this "plain language," the Court likewise eschewed any resort to the statute's legislative history. *See id.* at 474.

But while affirming the conviction in *Salinas/Marmolejo,* the Court did not necessarily affirm the Fifth Circuit's expansive reading of the statutory language, either as a matter of statutory construction or constitutional law. *See id.* at 475. To be candid, *Salinas* is less than clear on both fronts. In addressing the statute, the Court said:

> We need not consider whether the statute requires some other kind of connection between a bribe and the expenditure of federal funds, for in this case the bribe was related to the housing of a prisoner in facilities paid for in significant part by the federal funds themselves. *And that rela-*

tionship is close enough to satisfy whatever connection the statute might require.

*Salinas,* 118 S.Ct. at 474 (italics supplied).

Indeed, the Court intimated, as other courts and scholars have done,[15] that any other interpretation of § 666, one that does not require a federal connection at all, could well be unconstitutional:

> Furthermore, there is no serious doubt about the constitutionality of section 666(a)(1)(B) as applied to the facts of this case. Beltran was without question a prisoner held in a jail managed pursuant to a series of agreements with the Federal Government. The preferential treatment accorded to him was a threat to the integrity and proper operation of the federal program. *Whatever might be said about section 666(a)(1)(B)'s application to other cases,* the application of section 666(a)(1)(B) to Salinas did not extend federal power beyond its proper bounds.

*Salinas,* 118 S.Ct. at 475 (italics supplied.)

Thus, with little explanation, the Court left open the possibility that other cases with different facts may not satisfy "whatever connection the statute might require" between the corrupt act and funds received by the state or between the corrupt act and the federal program, and may extend federal power beyond its proper bounds. *See id.* at 474–75. If there were ever a case that went too far in extending federal power, I believe it is the case before me.

---

**13.** Justice Lombard, dissenting in *Foley,* agreed that the statute was quite clear and plainly suggested broad coverage over "any" transaction. 73 F.3d at 495 (Lombard dissenting) ("The statute does not create the limitation the majority creates."). Likewise, Professor Brown concludes that this is an "unambiguously broad" statute, with legislative history that is almost as "unambiguously narrow." *See* Brown, *supra* at 275. For Professor Brown, the only recourse is to consider the statute's constitutionality as applied to situations in which there is no federal connection.

**14.** The defendant in *Salinas* was charged with violations of Section 666(a)(1)(B)—"corruptly . . . accept[ing] or agree[ing] to accept, anything of value from any person . . ." 118 S.Ct. at 473. Although the defendant in this case is charged under Section 666(a)(2), I find that the analysis in *Salinas* applicable to this case.

**15.** In *United States v. Frega,* the district court of the Southern District of California held that any reading of section 666 that requires no connection to federal funds, would "drastically change the balance of power between federal and state governments by bringing conduct that had previously been entirely in the realm of the states within the federal purview." 933 F.Supp. 1536, 1540 (S.D.Cal.1996). Citing to *United States v. Bass,* 404 U.S. 336, 349, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971), the Court concluded that "unless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal state-balance". *Id.* At 1539. Professor Brown makes a similar argument in his article, albeit more directly, and with considerably more persuasive power. *See* Brown, *supra* at 297–305.

Consider the facts of *Salinas:* While *Salinas* did not involve the manipulation of federal monies, it did involve the conduct of a federal program. There was an agreement between the Federal Marshals and local government officials whereby the county would take custody of federal prisoners in exchange for federal grants to the county to improve the jail and to cover daily costs for each federal prisoner. *See id.* at 472. In fact, the defendants were directly administrating the program which received the federal funds. *See Marmolejo,* 89 F.3d at 1188. Finally, the conduct which was the subject of the bribe was conjugal visits for one of the federal prisoners. *See Salinas,* 118 S.Ct. at 474–75.

In contrast, this case involves no connection whatsoever between the alleged conduct and either the federal funds that conferred jurisdiction, or the programs those funds authorized. Indeed, even the crimes for which McCormack was being investigated were all state offenses.

Under the Government's theory of prosecution, § 666 would essentially become a general federal anti-corruption statute. As every state is likely to receive at least $10,000 in federal funding,[16] any corrupt act committed by a state agent anywhere within its borders, somehow meeting the $5,000 value requirement, could now fall within the jurisdiction of the federal authorities, even if there were no connection to federal funds.

While this broad interpretation of the statute is entirely plausible, *see Marmolejo,* 89

F.3d at 1193–94, there is no question that it would result in a drastic change in the balance of power between federal and state governments. *See Frega,* 933 F.Supp. at 1540. To avoid that result, a number of courts, as described above, have transformed the statutory language so as to require a federal connection. *See e.g., Foley,* 73 F.3d at 490, 492; *Frega,* 933 F.Supp. at 1543. *Foley* was the template: The "in connection with any business or transaction" language, is ambiguous, justifying a review of legislative history. *See Foley,* 73 F.3d at 489–90; *Frega,* 933 F.Supp. at 1539–41. That legislative history reveals an intent to deal with corruption that is tied to federal programs or monies. *See* 73 F.3d at 490; *see also Frega,* 933 F.Supp. at 1541.

But *Salinas* has shut off this avenue of analysis. It has announced that the statutory language, "in connection with any business or transaction," is not ambiguous. *Salinas,* 118 S.Ct. at 473–74. The language is clear, and the reach of the statute is clearly broad. *See Id.*

The remaining question then, is whether or not the statute is constitutional as applied to cases like the instant one, in which there is little or no relationship between the bribery and the federal program conferring jurisdiction.[17]

Even if the Congress has the authority to create such a federal anti-corruption statute under the spending power,[18] in *United States*

---

**16.** *See* Brown, *supra* at 276 & n. 236 ("All states and thousands of cities, towns, counties and special districts receive federal funds").

**17.** The court in *United States v. LaHue* continued the tradition of finding limiting language in section 666, this time in section 666(b)—the $10,000 benefits section, in order to find the statute inapplicable to the facts of the case. 998 F.Supp. 1182, 1186, 1192 (D.Kan.1998). The Court was clearly concerned with the same federal-state balance issues as described above. *See id.* at 1187, 1192 (noting that nearly every organization in one way or another receives "benefits" in excess of $10,000 from federal funds—including grocery stores that accept food stamps or agents who use highways constructed in part with federal monies). Instead of constitutional analysis, however, the Court reflected that concern in a narrow interpretation of the "benefits" language. *See id.* at 1192.

*LaHue* involved the indictment of two doctors for conspiring to defraud the federal government by receiving bribes—in the form of "consulting fees"—to refer Medicare paying patients to certain hospitals. *See id.* at 1184. The defendants argued, and the Court agreed, that their ultimate receipt, in payment for medical services, of money whose origin is from Medicare did not make them recipients of "benefits in excess of $10,000 under a Federal Program...," as the contemplated by the statute. *See id.* at 1185. Based on its review of the legislative history and case analysis of the ambiguous statute language, the Court concluded that once a federal program "benefit" reaches its target recipient—the patient—it loses its character as a "benefit." *Id.* at 1186–87.

**18.** Courts have held that section 666 was passed pursuant to Congress' tax and spending power as set forth in Article I, Section 8. *See United States v. Russo,* 111 F.3d 124, 1997 WL 168276, *2

*v. Bass,* 404 U.S. 336, 349, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971),[19] and more recently in *United States v. Lopez,* 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995),[20] the Supreme Court has expressed concerns whenever an interpretation of a federal criminal statute would upset the balance of power between the federal and state governments. *See also Frega,* 933 F.Supp. at 1540 (citing *Bass* ). This is especially so when the conduct at issue—bribing a local police officer—is also a state crime.[21] *See id.* at 1540–41.

There is little or no constitutional precedent as applied to § 666, and limited scholarly commentary. *See* Brown, *supra* at 247. Nevertheless, the lessons gleaned from recent Supreme Court statements suggest that whatever other applications of § 666 may be constitutional, this one is not. *See Salinas,* 118 S.Ct. at 474, 475.

Despite the fact that the Supreme Court has imposed fewer constraints on Congress' ability to regulate state government under the auspices of the spending power then the Court has under other enumerated powers,

recent constitutional jurisprudence suggests that it is most certainly limited. *See South Dakota v. Dole,* 483 U.S. 203, 207–08, 107 S.Ct. 2793, 97 L.Ed.2d 171 (1987); *see also United States v. Lopez,* 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995).

At issue in *Dole* was a condition of federal highway aid directing withholding a percentage of funds in states with a minimum drinking age of less than twenty-one years. 483 U.S. at 205, 107 S.Ct. 2793. The Court upheld the condition based on Congress' authority under the Spending Clause to enact such conditions on states' access to federal funds. *See id.* at 206, 107 S.Ct. 2793.

Notwithstanding its emphasis on Congress' ability to go beyond specific enumerated powers and to use conditions "to further broad policy objectives by conditioning receipt of federal monies upon compliance with federal statutory and administrative directives," the Court enunciated four limits on the exercise of the spending power. *See* 483 U.S. at 206, 207–08, 107 S.Ct. 2793.[22] These

(2nd Cir.); *United States v. Ferrara,* 990 F.Supp. 146, 152 (E.D.N.Y.1998); *United States v. Cantor,* 897 F.Supp. 110, 113 (S.D.N.Y.1995).

**19.** In *United States v. Bass,* the Supreme Court adopted a narrow reading of former 18 U.S.C.A.App. Section 1202(a)—which made it a crime for a felon to "receiv[e], possess, or transpor[t] in commerce ... any firearm"—in effect, creating a saving constitutional interpretation. 404 U.S. at 347, 92 S.Ct. 515. The Court found the statute ambiguous, referred to the legislative history, and then considered concerns about the limits of federal police power. *See id.* at 345–47, 92 S.Ct. 515.

**20.** In *United States v. Lopez,* the Supreme Court limited the reach of federal policing in the area of the Commerce Clause. 514 U.S. at 566–67, 115 S.Ct. 1624.

**21.** Massachusetts General Laws chapter 268A section 17 provides: "(a) No municipal employee shall, otherwise than as provided by law ... directly or indirectly receive ... compensation from anyone other than the city or town or municipal agency ... (b) No person shall knowingly, ... directly or indirectly give, promise or offer such compensation ... Whoever violates any provision of this section shall be punished by a fine of not more than three thousand dollars or by imprisonment for not more than two years, or both."

**22.** Professor Brown raises two major objections to the use of the *Dole* analysis when considering

the constitutionality of section 666. The first is that section 666 is not clearly a "condition" statute—a requirement for the *Dole* limitation analysis. *See id.* at 292, 107 S.Ct. 2793. A condition statute generally requires a state's compliance with federal regulatory or administrative directives in exchange for receipt of federal funds. *See id.* (citing *Commonwealth of Virginia Dep't of Educ. v. Riley,* 106 F.3d 559, 570–72(4th Cir.1997)(en banc)(plurality opinion),rev'g 86 F.3d 1337(4th Cir.1996)). Professor Brown notes that section 666 does not require this form of compliance or necessarily apply directly to the recipient governments. *See id.* However, Brown does find that section 666 is sufficiently like a "condition" statute because the recipient can avoid the statute's application to its officials by not accepting federal funds of $10,000 or more. *See id.* Furthermore, it sets out federal requirements for recipient governments, and prescribes negative consequences if those requirements are not followed. *See id.*

The second objection relates to applying the spending power precedent to section 666 because Congress has foreclosed any constitutional inquiry where Congress has provided a jurisdictional predicate or element. *See* Brown, *supra* at 293. Brown addresses this objection by distinguishing section 666 from statutes which have jurisdictional elements that directly link the wrongdoing to the subjects over which the Congress has power. *See id.* Although section 666 does require the receipt of $10,000 dollars annually in federal assistance, Brown emphasizes that

limits on Congress' power—exceeding any of which could result in finding that a statute is unconstitutionally broad—include: (1) the power must be used in pursuit of the general welfare; (2) Congress must state any conditions unambiguously; (3) conditions must be related to the federal interest in particular national projects or programs; and, (4) conditions must not violate other independent constitutional restrictions on government activity. *Id.* at 207–208, 107 S.Ct. 2793. Of the four limits established in *Dole,* limit(3)—requiring that the conditions be related to the federal interest in particular national projects or programs—provides the most plausible attack on § 666(a).

The Supreme Court in *Dole* specifically did not define the outer bounds of the "relatedness" limitation. *See* 483 U.S. at 209, n. 3, 107 S.Ct. 2793. Although amici in *Dole* urged the Court to establish that a condition on federal funds is legitimate only if it relates directly to the purpose of the expenditure, the Court declined to address whether conditions less directly related than the ones in the case before it might be outside the bounds of the spending power. *Id.*

Additionally, in *New York v. United States,* 505 U.S. 144, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992), the Court also addressed the fact that the "relatedness" limit must have some content. *See* 505 U.S. at 167, 112 S.Ct. 2408. In *New York,* the Court considered the constitutionality of the Low-level Radioactive Waste Policy Amendments Act. *Id.* at 149, 112 S.Ct. 2408 (holding that the Act's monetary and access incentives provisions were constitutional, but that the "take title" provision was outside Congress' enumerated powers). While considering the possible sources of Congressional authority to enact this statute, the Court stated that under the "relatedness" limit to the Spending Clause, the conditions must bear some relationship to the purpose of the federal spending. *See id.* at 167, 112 S.Ct. 2408 (citing *Dole,* 483 U.S. at 207–208, 209 n. 3, 107 S.Ct. 2793). Otherwise, the Court noted, "the spending power could render academic the Constitution's oth-

er grants and limits of federal authority." *Id.*

■ Guided only by these general principals, the next step is to define the federal interests to which the § 666(a)'s condition must be related. The stated purpose for enacting § 666(a) is to protect the *"integrity* of federal program funds from theft, embezzlement and acts of bribery." *United States v. Russo,* 111 F.3d 124, 1997 WL 168276 *2 (2nd Cir.) (citing *United States v. Coyne,* 4 F.3d 100, 109 (2nd Cir.1993)(italics supplied)). As illustrated by the continuum above, "integrity" of federal funds could have a range of meanings including: keeping the federal funds intact; preventing them from being spent or administered under dishonest conditions; or a more general concern for acts of the entities as a whole which receive them— *e.g.* an entire state, if this state received federal funds. *See also* Brown, *supra* at 278. If "integrity" is defined to consider only the situations described as category (1) and (2), or, at the very least, the standard implicit in *Salinas* --the extent to which the federal program is undermined--then many applications of § 666(a), similar to this one, will fail. *See* Brown, *supra* at 295. Alternatively, if "integrity" is considered more broadly to include any acts of the recipient organization— regardless of whether the actual conduct in question has anything to do with the federal funds or programs, "relatedness" would obviously be satisfied. *See id.*

Other courts which have considered Spending Clause challenges to § 666 provide little guidance on how to resolve the question of the appropriate breadth of "integrity" under the relatedness limit to the spending power. For example, in *United States v. Russo,* the Second Circuit upheld the constitutionality of § 666 after consideration of only one *Dole* limitation—whether the expenditures and conditions are made in pursuit of "the general welfare." 1997 WL 168276, at *2. In effect, *Russo* did not deal with whether the conditions imposed by the application of § 666 were related to the federal funds at all. *See id.*

there may well be constitutional problems with section 666 precisely because there is no such

specific link in this statute. *See id.*

Moreover, in *United States v. Ferrara,* a case decided after *Salinas,* the defendant was charged with attempting to bribe a member of the Town Board to influence a zoning decision that directly affected the financial interests of the Town—a recipient of $10,000 or more of federal funds. 990 F.Supp. 146, 148 (E.D.N.Y.1998). Facing a constitutional challenge, the court, without mention of *Salinas,* narrowly applied the principals in *Dole* by stating that "the conduct which is the subject of *the present indictment* is *related to* the federal government's legitimate interest in protecting federal funds." *Id.* at 152 (Italics supplied). The *Ferrara* court stated further that the principals of federalism "have not been compromised *here*" again reaching only far enough to find the application of § 666 constitution in that case, not in general. *Id.* (Italics supplied).[23]

■ Directed by the concerns expressed in *Salinas* about applying § 666(a) to conduct that has no connection with the federal funds or programs, and the broader concerns of *Lopez* and *Bass,* I find that "integrity" must be more carefully construed to provide for at least some nexus with the federal funds or programs. *See Salinas,* 118 S.Ct. at 474–475; *Foley,* 73 F.3d at 490; *Frega,* 933 F.Supp. at 1541. Establishing such a requirement is consistent with the limits the Supreme Court has placed on the spending power. *See Dole,* 483 U.S. at 209, n. 3. In particular, it gives meaningful content to the "relatedness" standard as applied to this statutory scheme. *See id.*

■ Clearly the conduct at issue here— bribing a local police officer to prevent further investigation and/or prosecution for state crimes—is not "related to a legitimate national problem" because it is not directed towards protecting the integrity of federal funds given to the Malden police department

or even to the programs those funds were intended to support. *Compare Ferrara,* 990 F.Supp. at 152. Therefore I find it is unconstitutional to prosecute the defendant in this case under § 666(a).

## IV. CONCLUSION

Based on these facts, I find that the instant prosecution is defective in two respects: a) that it fails to meet the "$5,000 value" requirement; and, b) that there is no connection between the conduct at issue—the police favors—and the federal funds, or the federal program to warrant a federal rather than a state prosecution of these matters. However, broadly this statute has been interpreted, it cannot be stretched to go this far.

Therefore, I **GRANT** Motion To Dismiss.

**SO ORDERED.**

**23.** In *United States v. Bigler,* the court applied the necessary and proper clause in conjunction with the Spending Clause to hold that Congress could generally enact section 666, but did not address the question of whether it was constitutional as applied. *See* 907 F.Supp. 401, 402 (S.D.Fla.1995). The Court recognized the purpose of section 666 as the intention to "safeguard finite federal resources from corruption and to

police those with control of federal funds," while in the instant case, neither the Malden police officer nor McCormack has any control over the federal funds. *See id.* Finally, in *United States v. Cantor,* the Court did not consider the Spending Clause argument because it found that section 666 did not impose a condition on the receipt of the funds, so the *Dole* analysis did not apply. *See* 897 F.Supp. 110, 112 (S.D.N.Y.1995).