**UNITED STATES of America, Plaintiffs,**

v.

**Efraim GARCIA, Defendants.**

No. 97–80727.

United States District Court, E.D. Michigan, Southern Division.

Aug. 23, 2000.

William J. Sauget, David J. Debold, United States Attorney's Office, Detroit, MI, for Plaintiff.

Federal Defender's Office, Detroit, MI, Jeffrey Urdangen, Chicago, IL, Harold Z. Gurewitz, Margaret S. Raben, Gurewitz & Raben, Robert F. Kinney, III, Detroit, MI, for Defendant.

## OPINION & ORDER GRANTING DEFENDANT'S MOTION FOR REHEARING AND GRANTING DEFENDANT'S MOTION TO DISMISS THE THIRD SUPERCEDING INDICTMENT

EDMUNDS, District Judge.

This matter comes before the Court on Defendant's motion for rehearing of this Court's September 22, 1999 opinion and order granting in part and denying in part Defendant's motion to dismiss the indictment on federal jurisdictional grounds. Relying primarily on two recent United States Supreme Court decisions which address the limits of federal power, Defendant moves for rehearing of this Court's decision to deny in part his previous motion to dismiss with respect to Counts I and II which allege violations of RICO, 18 U.S.C. § 1961, *et. seq.* For the reasons stated below, the Court agrees that the recent Supreme Court authority relied upon by Defendant compels the conclusion that this Court lacks jurisdiction to decide the RICO charges brought by the Government in this case. Accordingly, Defendant's motion for rehearing is GRANTED and the remaining counts of the indictment are DISMISSED.

## I. Introduction

■ The United States Constitution established a system of dual sovereignty. *Printz v. United States,* 521 U.S. 898, 918, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997); *Gregory v. Ashcroft,* 501 U.S. 452, 457, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991). Reflected throughout the Constitution is the principle that, "[a]lthough the States surrendered many of their powers to the new Federal Government, they retained a 'residuary and inviolable sovereignty[.]'" *Printz,* 521 U.S. at 918–19, 117 S.Ct. 2365 (quoting The Federalist No. 39, at 245 (James Madison)). One hundred and thirty years ago, the Court explained the necessity of the dual system:

"[T]he people of each State compose a State, having its own government, and endowed with all functions essential to separate and independent existence ... [W]ithout the States in union, there could be no such political body as the United States." Not only, therefore, can there be no loss of separate and independent autonomy to the States, through their union under the Constitution, but it may be not unreasonably said that the preservation of the States, and the maintenance of their governments, are as much within the design and care of the Constitution as the preservation of the Union and the maintenance of the National government. The Constitution, in all its provisions, looks to an indestructible Union, composed of indestructible States.

*Texas v. White,* 74 U.S. 700, 7 Wall. 700, 725, 19 L.Ed. 227 (1868)(overruled on other grounds by *Morgan v. United States,* 113 U.S. 476, 20 Ct.Cl. 533, 5 S.Ct. 588, 28 L.Ed. 1044 (1885)(footnote omitted))(quoting *Lane County v. Oregon,* 74 U.S. 71, 7 Wall. 71, 76, 19 L.Ed. 101 (1868)).

It is well-established that the Constitution created a federal government of limited powers. This principle is embodied in the Tenth Amendment, which provides that, "[t]he powers not delegated to the United States by the Constitution, nor pro-

hibited by it to the States, are reserved to the States respectively, or to the people." U.S. CONST. amend. X. As the Supreme Court has recently reminded us, "[t]he States thus retain substantial sovereign authority under our constitutional system." *Gregory v. Ashcroft,* 501 U.S. 452, 457, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991). James Madison observed, in The Federalist No. 45 that, "[t]he powers reserved to the several States will extend to all the objects which, in the ordinary course of affairs, concern the lives, liberties, and properties of the people, and the internal order, improvement and prosperity of the State." *Id.*

The principles and advantages underlying the dual sovereignty doctrine are numerous. The *Gregory* Court described them as being four-fold. The doctrine "assures a decentralized government that will be more sensitive to the diverse needs of a heterogenous society; it increases opportunity for citizen involvement in democratic processes; it allows for more innovation and experimentation in government; and it makes government more responsive by putting the States in competition for a mobile citizenry." *Gregory,* 501 U.S. at 458, 111 S.Ct. 2395.

In addition to these important concerns, one of the most important aspects of our dual system is that it provides a check on the abuses of governmental power. In-

deed, "[t]he 'constitutionally mandated balance of power' between the States and the Federal Government was adopted by the Framers to ensure the protection of 'our fundamental liberties.'" *Id.* (quoting *Atascadero State Hosp. v. Scanlon,* 473 U.S. 234, 242, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985)).

The power of Congress to enact legislation and to impose its statutory preferences on the states is not unlimited. Especially in the criminal context, " '[s]tates possess primary authority for defining and enforcing the criminal law.'" *United States v. Lopez,* 514 U.S. 549, 561, n. 3, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995)(quoting *Brecht v. Abrahamson,* 507 U.S. 619, 635, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993)). "When Congress criminalizes conduct already denounced as criminal by the States, it effects a 'change in the sensitive relation between federal and state criminal jurisdiction.'" *Lopez,* 514 U.S. at 561, n. 3, 115 S.Ct. 1624 (quoting *United States v. Enmons,* 410 U.S. 396, 411–12, 93 S.Ct. 1007, 35 L.Ed.2d 379 (1973)).

In a number of recent rulings, the U.S. Supreme Court has reaffirmed many of these principles of dual sovereignty.[1] One common theme that can be gleaned from these recent decisions is that the States retain "a residuary and inviolable sovereignty," *Alden v. Maine,* 527 U.S. 706, 119 S.Ct. 2240, 2247, 144 L.Ed.2d 636 (1999),

1. *See, e.g., Alden v. Maine,* 527 U.S. 706, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999)(Congress cannot subject state to suit in state court without state's consent); *College Savings Bank v. Florida Prepaid Postsecondary Education Expense Bd.,* 527 U.S. 666, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999)(sovereign immunity not abrogated by Trademark Remedy Clarification Act, nor voluntarily waived by state's activities in interstate commerce); *Florida Prepaid Postsecondary Education Expense Bd. v. College Savings Bank,* 527 U.S. 627, 119 S.Ct. 2199, 144 L.Ed.2d 575 (1999)(neither Commerce Clause nor Patent

Clause give Congress the authority to abrogate state sovereign immunity in Patent and Plant Variety Protection Remedy Clarification Act); *City of Boerne v. Flores,* 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997)(Religious Freedom Reformation Act held unconstitutional as a violation of Congress' power under Fourteenth Amendment); *Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996)(Congress lacks authority under the Indian Commerce Clause to abrogate the states' Eleventh Amendment immunity).

and that far-reaching though Congress' power may be, its use of that power must not "contradict vital principles necessary to maintain separation of powers and the federal balance." *City of Boerne v. Flores*, 521 U.S. 507, 536, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997). "Although the Constitution grants broad powers to Congress, our federalism requires that Congress treat the States in a manner consistent with their status as residuary sovereigns and joint participants in the governance of the Nation." *Alden*, 119 S.Ct. at 2263.

It is the holding of this Court that the assertion of federal jurisdiction over the criminal conduct indicted in this case violates these principles of federalism, and arrogates to the federal government a police power that is constitutionally reserved to the States.

## II. Background

### A. Facts

As this Court explained in its previous opinion and order, the Third Superceding Indictment (hereinafter "indictment") charges the defendant, Efraim Garcia, with alleged membership in a street gang known as the "Cash Flow Posse." This gang allegedly emerged in 1988–89 to counteract high pressure recruiting tactics of two national street gangs, the Latin Counts and the Cobras, who attempted to recruit new members in southwest Detroit. In lieu of joining the existing gangs, twelve young men created their own group which became known as the "Cash Flow Posse."

The indictment charges the alleged members of the gang with numerous acts of murder and assault. Defendant Garcia is alleged to have murdered Douglas Williams, LaVonda Brown, James Goings, Annie Johnson, and Evan Ison. He also allegedly conspired to murder and assaulted with the intent to murder, Shirley Johnson. Finally, he is alleged to have committed several other assaults with intent to murder and to have conspired with other members of the Cash Flow Posse to murder rival gang members.

### B. The Cash Flow Posse's Connection to Commerce

Count I alleges a violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c); § 1961(1); § 1961(5). The indictment alleges that the Cash Flow Posse, of which Garcia was allegedly a member, is an "enterprise" as that term is defined in 18 U.S.C. § 1961(4), and that the enterprise engaged in and its activities affected interstate commerce, in five ways:

(1) Gang members traveled on an interstate highway (I–94) from Detroit to Port Huron (which are both Michigan cities) to commit murders;

(2) One gun used by gang members was manufactured in another state;

(3) Guns used by the gang were purchased at the Gibraltar Trade Center, which frequently does business with citizens from other states;

(4) A cellmate of one gang member told a law enforcement officer that the member had alluded to the possibility of Cash Flow Posse chapters or sects existing in other states; and

(5) One gang member, in his plea colloquy, acknowledged that other gang members conducted a meeting while they were in Mexico for the purpose of discussing the gang's strategy with regard to the law enforcement initiatives against them. (*See* Supplemental Submission of the Gov't, Ex. 7 at 25).

The indictment also alleges that the enterprise engaged in a pattern of racketeering activity consisting of twelve acts, including murder, conspiracy to commit

murder, and assault. The predicate acts do not include crimes which are economic in character such as extortion, hijacking, drug trafficking, or armed robbery.

Count II alleges that Defendant Garcia violated the RICO conspiracy statute, 18 U.S.C. § 1962(d), by conspiring with others to violate 18 U.S.C. § 1962(c), which forms the basis for Count I. The pattern of racketeering activity consists of the various acts delineated in Count I, and no additional ties to interstate commerce are alleged.

## C. Relevant Procedural History

Following numerous pretrial motions, on September 22, 1999, this Court granted in part Defendant's motion to dismiss the indictment on federal jurisdictional grounds. *See United States v. Garcia,* 68 F.Supp.2d 802 (E.D.Mich.1999). Specifically, this Court granted the motion with respect to Counts III and IV which alleged violations of the Violent Crimes in Aid of Racketeering ("VCAR") statute, 18 U.S.C. § 1959. *Garcia,* 68 F.Supp.2d at 811–13. This Court denied the motion with respect to Counts I and II which, as discussed above, allege violations of RICO. *Id.* at 809–11. It is this Court's decision with respect to Counts I and II which Defendant argues must be reconsidered due to two recent United States Supreme Court opinions concerning the breadth of federal power over crimes traditionally prosecuted and regulated by the states. *See United States v. Morrison,* 529 U.S. 598, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000)(invalidating the Violence Against Women Act on its face); and *Jones v. United States,* 529 U.S. 848, 120 S.Ct. 1904, 146 L.Ed.2d 902 (2000)(holding that the federal arson statute "covers only property currently used in commerce or in an activity affecting commerce" and thus cannot apply to the arson of an owner-occupied dwelling used as a private residence).

## III. Standard of Review

■■■ Pursuant to Federal Rule of Criminal Procedure 12(b)(2), a defendant may raise "[d]efenses and objections based on defects in the indictment or information" before trial. Fed.R.Crim.P. 12(b)(2). Challenges to the efficacy of federal jurisdiction may be raised at any time during the pendency of the proceedings. *Id.; United States v. Vanover,* 888 F.2d 1117, 1120 (6th Cir.1989), *cert. denied,* 495 U.S. 934, 110 S.Ct. 2177, 109 L.Ed.2d 506 (1990). As used in Rule 12, jurisdiction refers to jurisdiction over the subject matter. *United States v. Chambers,* 944 F.2d 1253, 1259–60 (6th Cir.1991), *cert. denied,* 502 U.S. 1112, 112 S.Ct. 1217, 117 L.Ed.2d 455 (1992). A district court may make "preliminary findings of fact necessary to decide questions of law presented by pretrial motions so long as the trial court's conclusions do not invade the province of the ultimate finder of fact." *United States v. Levin,* 973 F.2d 463, 467 (6th Cir.1992); *see also United States v. Craft,* 105 F.3d 1123 (6th Cir.1997)(Rule 12(b) permits pretrial consideration of any defense that is "capable of determination without trial of the general issue." *Id.* at 1126); *United States v. Jones,* 542 F.2d 661, 664–65 (6th Cir.1976)(Rule 12 and accompanying notes support decision to dismiss indictment on motion raising legal questions).

■■■ In a general sense, the Government is correct that an indictment is sufficient if it (1) contains the elements of the offense charged; (2) fairly informs the defendant of the charges against him; and (3) enables him to plead an acquittal or conviction to bar future prosecutions for the same offense. *See Hamling v. United States,* 418 U.S. 87, 117, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974); *United States v.*

*Barker Steel,* 985 F.2d 1123, 1126 (1st Cir. 1993), *reh'g denied,* 985 F.2d 1136; *United States v. McCormack,* 31 F.Supp.2d 176, 179 (D.Mass.1998). Under this rule, it would normally be sufficient for the Government "to track the language of the indictment and include enough facts to put the defendant on notice of which conduct is challenged." *McCormack,* 31 F.Supp.2d at 180. However, there are exceptions to this rule when there is under consideration a threshold issue, "as to which the facts are uncontested, which comprise questions of law and not fact." *Id.; see also United States v. Korn,* 557 F.2d 1089, 1090 (5th Cir.1977)(propriety of granting a motion to dismiss an indictment pretrial depends on whether the issue involves law or determination of facts); *United States v. Caceres–Prado,* 601 F.Supp. 468, 470 (D.P.R. 1984)(same). Examples of threshold issues appropriately considered pretrial "include double jeopardy questions, statute of limitations questions, and ... questions of jurisdiction." *McCormack,* 31 F.Supp.2d at 180 (footnote omitted); *see also United States v. Smith,* 866 F.2d 1092, 1096 n. 3 (9th Cir.1989)(courts may consider lack of jurisdiction on motion to dismiss indictment); *Cf. United States v. Nippon Paper Indus. Co.,* 109 F.3d 1 (1st Cir.1997), *cert. denied,* 522 U.S. 1044, 118 S.Ct. 685, 139 L.Ed.2d 632 (court considered whether antitrust laws applied to Japanese Company despite the fact that the extraterritorial jurisdiction of the laws in question was related to an element of the offense that the jury was to consider, i.e. the impact of the claimed violation on interstate commerce).

Defendant here is raising a jurisdictional question concerning the scope of Congress' power under the Commerce Clause, to wit: whether the enterprise at issue engaged in interstate or foreign commerce, or whether its activities affected interstate or foreign commerce. Whether Congress has the power to reach the alleged criminal activity involved in this case is a question of law, not a question of fact for the jury. Thus, the issue may be determined pretrial.[2]

## IV. Analysis

As this Court recognized in its previous opinion, the indictment alleges a pattern of racketeering activity based solely upon "acts involving murder." *Garcia,* 68 F.Supp.2d at 805, n. 2. The predicate acts that form the basis for the RICO counts are based solely on violations of Michigan's murder statutes including Mich. Comp. Laws Ann. § 750.157(a); Mich. Comp. Laws Ann. § 750.316(1)(a); and Mich. Comp. Laws Ann. § 750.316. The predicate acts do not include other allegations such as robbery, hijacking, car theft, drug trafficking, or extortion, which are typically present in RICO prosecutions and which are more economic in character. *See, e.g., United States v. Diaz,* 176 F.3d 52 (2d Cir.1999) *cert. denied sub. nom.* 528 U.S. 875, 120 S.Ct. 314, 145 L.Ed.2d 153 (enterprise engaged in large-scale drug operation); *United States v. Polanco,* 145 F.3d 536 (2d Cir.1998) *cert. denied,* 525 U.S. 1071, 119 S.Ct. 803, 142 L.Ed.2d 664 (enterprise engaged in offenses involving drug and gun trafficking); *United States v. Torres,* 129 F.3d 710 (2d Cir.1997)(enterprise engaged in acts involving drugs,

2. The Court notes that the review of a legal question before jeopardy attaches "has another salutary effect, which may have been implicit in Rule 12." *McCormack,* 31 F.Supp.2d at 181. Consideration of the jurisdictional issue at this stage allows either side to appeal the ruling. "In contrast, obligating the court to consider such issues on a Rule 29 motion would foreclose a government appeal, if the trial court ruled for the defendant." *Id.* (citing Fed.R.Crim.P.29).

murder, extortion, armed robbery and firearms offenses); *United States v. Brady*, 26 F.3d 282 (2d Cir.1994)(enterprise engaged in murder and collection of unlawful debts).

In May of 2000, the United States Supreme Court decided two cases which place limitations on the reach of federal jurisdiction over non-economic crimes. The Court began by invalidating the Violence Against Women Act, 42 U.S.C. § 13981, which provided a federal civil remedy for victims of gender-motivated violence. *United States v. Morrison*, 529 U.S. 598, 120 S.Ct. 1740, 1754, 146 L.Ed.2d 658 (2000). *Morrison* was followed by *Jones v. United States*, 529 U.S. 848, 120 S.Ct. 1904, 146 L.Ed.2d 902 (2000), in which a unanimous Court held that the federal arson statute, 18 U.S.C. § 844(i), cannot, by its terms, be applied to the arson of an owner-occupied dwelling because the building was not used in commerce or in an activity affecting commerce.

The motion before the Court challenges the RICO statute as-applied, rather than on its face. Both *Morrison* and *Jones* impact the analysis of this case; *Morrison* for its Commerce Clause principles, and *Jones* for both its Commerce Clause discussion and its similar procedural posture, an as-applied challenge to the same statute of which RICO is a part.

## A. The Commerce Power

■■ Because Congress does not have unfettered discretion to pass laws, all federal enactments must be "based on one or more of its powers enumerated in the Constitution." *Morrison*, 120 S.Ct. at 1748; *Marbury v. Madison*, 5 U.S. 137, 1 Cranch 137, 176, 2 L.Ed. 60 (1803). The RICO statute at issue here finds its constitutional justification in the Commerce Clause, U.S. Const. art. I, § 8, cl. 3, which grants Congress the power to "regulate Com-

merce with foreign Nations, and among the several States, and with the Indian Tribes." *Id.* The Commerce Clause affords Congress the opportunity to regulate three categories of activity: (1) that involving the use of channels of interstate commerce; (2) that involving instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities, and finally (3) that substantially affecting interstate commerce. *Morrison*, 120 S.Ct. at 1749; *United States v. Lopez*, 514 U.S. 549, 558–59, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995). The third category is implicated in this case.

### 1. *Morrison*

In *Morrison*, the Supreme Court invalidated the Violence Against Women Act, 42 U.S.C. § 13981, on its face. The Court began by focusing on the 1995 decision in *United States v. Lopez*, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), which held that the Gun–Free School Zones Act of 1990, 18 U.S.C. § 922(q)(1)(A), which made it a federal crime to possess a firearm in a school zone, was unconstitutional under the Commerce Clause.

The Court stressed the importance of the economics involved in a proper Commerce Clause analysis: "First, we observed that § 922(q) was 'a criminal statute that by its terms has nothing to do with commerce' or any sort of economic enterprise, however broadly one might define those terms.'" *Morrison*, 120 S.Ct. at 1749–50. The Court explained that it had "upheld a wide variety of congressional Acts regulating intrastate economic activity where [it] ha[s] concluded that the activity substantially affected interstate commerce." *Id.* at 1750 (citing *Lopez*, 514 U.S. at 559, 115 S.Ct. 1624). The Court stressed that its pattern of

analysis was clear: "Where *economic* activity substantially affects interstate commerce, legislation regulating that activity will be sustained." *Morrison*, 120 S.Ct. at 1750 (emphasis added)(citing *Lopez*, 514 U.S. at 560, 115 S.Ct. 1624).

Before delving into a detailed breakdown of *Lopez*'s framework, *Morrison* criticized the petitioners and the dissent for downplaying "the role that the *economic nature* of the regulated activity plays in our Commerce Clause analysis." *Id.* at 1750 (emphasis added). The Court stated, "a fair reading of *Lopez* shows that the noneconomic, criminal nature of the conduct at issue was central to our decision in that case." *Id.* (citing eight instances in *Lopez* where the Court stressed the importance of economic activity). In sum, the Court prefaced its more detailed discussion of *Lopez* with the following characterization:

> *Lopez*'s review of Commerce Clause case law demonstrates that in those cases where we have sustained federal regulation of intrastate activity based upon the activity's substantial effects on interstate commerce, the activity in question has been some sort of *economic* endeavor.

*Id.* at 1750 (emphasis added)(citing *Lopez*, 514 U.S. at 559–60, 115 S.Ct. 1624).

In addition to emphasizing the economic foundation, *Morrison* reiterated the three other factors stated in *Lopez* which are important to resolving whether a statute is facially unconstitutional: (1) whether the statute contains an express jurisdictional element which might limit its reach to a discrete set of facts that "have an explicit connection with or effect on interstate commerce," *Morrison*, 120 S.Ct. at 1750–52; (2) whether the legislative history of the statute contains express congressional findings regarding the effects upon interstate commerce of the proscribed activity,

*Id.* at 1751; and (3) whether the link between the proscribed activity and the effect on interstate commerce is attenuated. *Id.*

With respect to attenuation, the Court made clear that arguments about the "costs of crime" and "national productivity" were not persuasive. In *Lopez*, the Government sought to justify the Gun–Free School Zones Act by arguing that the possession of guns may lead to violent crime and that violent crime "can be expected to affect the functioning of the national economy in two ways. First, the costs of violent crime are substantial, and, through the mechanism of insurance, those costs are spread throughout the population. Second, violent crime reduces the willingness of individuals to travel to areas within the country that are perceived to be unsafe." *Lopez*, 514 U.S. at 563–64, 115 S.Ct. 1624. The Court observed that it had previously rejected these arguments "because they would permit Congress to 'regulate not only all violent crime, but all activities that might lead to violent crime, regardless of how tenuously they relate to interstate commerce.'" *Morrison*, 120 S.Ct. at 1751 (quoting *Lopez*, 514 U.S. at 564, 115 S.Ct. 1624).

With those principles from *Lopez* in mind, the Court proceeded to apply the principles to the statute before it and concluded that the statute was facially invalid. The Court first stated that "[g]ender-motivated crimes of violence are not, in any sense of the phrase, economic activity." *Morrison*, 120 S.Ct. at 1751. Second, the Court noted that, like the statute in *Lopez*, the Violence Against Women Act contained no jurisdictional element which might tie the statute to interstate commerce. Finally, the Court noted Congressional findings regarding the serious impact of gender-motivated violence on victims and their families. It dismissed the findings, howev-

er, stating that "simply because Congress may conclude that a particular activity substantially affects interstate commerce does not make it so." *Id.* Rather, the Court observed that whether a particular operation affects interstate commerce "sufficiently enough to come under the constitutional power of Congress to regulate ... is ultimately a judicial rather than a legislative question, and can be settled finally only by this Court." *Id.* (citing *Lopez,* 514 U.S. at 557, n. 2, 115 S.Ct. 1624).

Congress sought to justify the enactment of the Violence Against Women Act on the grounds that

> gender-motivated violence affects interstate commerce by deterring potential victims from traveling interstate, from engaging in employment in interstate business, and from transacting with business, and in places involved in interstate commerce; ... by diminishing national productivity, increasing medical and other costs and decreasing the supply of and the demand for interstate products.

H.R. Conf. Rep. No. 103–711, at 385.

The Court in *Morrison* rejected the justification, reasoning that "the concern that we expressed in *Lopez* that Congress might use the Commerce Clause to completely obliterate the Constitution's distinction between national and local authority seems well founded." *Morrison,* 120 S.Ct. at 1752 (citing *Lopez,* 514 U.S. at 564, 115 S.Ct. 1624). The Court noted that

> Indeed, if Congress may regulate gender-motivated violence, it would be able to regulate murder or any other type of violence since gender-motivated violence, as a subset of all violent crime, is certain to have lesser economic impacts than the larger class of which it is a part.

*Morrison,* 120 S.Ct. at 1754 (citations omitted).

The Court summarized its holding:

> We accordingly reject the argument that Congress may regulate noneconomic, violent criminal conduct based solely on that conduct's aggregate effect on interstate commerce. The Constitution requires a distinction between what is truly national and what is truly local.

. . . . .

> In recognizing this fact we preserve one of the few principles that has been consistent since the Clause was adopted. The regulation and punishment of intrastate violence that is not directed at the instrumentalities, channels, or goods involved in interstate commerce has always been the province of the States.

. . . . .

> Indeed, we can think of no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims.

*Id.* (citations omitted).

### 2. *Jones*

Shortly after *Morrison,* a unanimous Supreme Court vacated a conviction in *Jones v. United States,* 529 U.S. 848, 120 S.Ct. 1904, 146 L.Ed.2d 902 (2000), holding that the federal arson statute did not cover the arson of a private residence because the owner-occupied residence was not used for any commercial purpose.

The federal arson statute, 18 U.S.C. § 844(i), makes it a federal crime to damage or destroy, "by means of fire or an explosive, any ... property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce." *Id.* Congress enacted this statute as part of Title XI of the Organized Crime

Control Act ("OCCA") of 1970, Pub.L. 91–452, § 1102, 84 Stat. 952.[3] Congress criminalized the behavior "because of the need 'to curb the use, transportation, and possession of explosives.'" *Jones*, 120 S.Ct. at 1909 (quoting *Russell v. United States*, 471 U.S. 858, 860, n. 5, 105 S.Ct. 2455, 85 L.Ed.2d 829 (1985)).

The precise question before the Court in *Jones* was whether " § 844(i) cover[s] property occupied and used by its owner not for any commercial venture, but as a private residence. Is such a dwelling place, in the words of § 844(i), 'used in . . . any activity affecting . . . commerce'" *Jones*, 120 S.Ct. at 1909.

In its attempt to justify the conviction, the Government emphasized the breadth of the terms "affecting commerce"; the Court, however, stressed the importance of the word "used":

> The key word is "used". Congress did not define the crime described in § 844(i) as the explosion of a building *whose damage or destruction* might affect commerce . . . . Congress required that the *damaged or destroyed property itself* have been used in commerce or in an activity affecting commerce. The proper inquiry . . . is into the function of the building itself, and then a determination of whether that function affects interstate commerce.

*Jones*, 120 S.Ct. at 1909–10 (citations omitted)(emphasis added).

The Court then turned to whether the private residence at issue was "used in commerce or in an activity affecting commerce." The Government argued that the residence was "constantly" used in interstate commerce because (1) "the homeowner 'used' the [Fort Wayne, Indiana]

dwelling as collateral to obtain and secure a mortgage from an Oklahoma lender; the lender, in turn 'used' the property as security for the home loan; (2) the homeowner 'used' the residence to obtain a casualty insurance policy from a Wisconsin insurer; and (3) the homeowner 'used' the dwelling to receive natural gas from sources outside Indiana." *Jones*, 120 S.Ct. at 1910 (citing Brief of the United States at 19–23).

The Court rejected the Government's submission concerning purported ties to interstate commerce, emphasizing that the term "used in an activity affecting commerce" . . . "is most sensibly read to mean active employment for commercial purposes, and not merely a passive, passing, or past connection to commerce." *Jones*, 120 S.Ct. at 1910. The term "use" . . . "ordinarily signifies 'active employment.'" *Id.* (citing *Bailey v. United States*, 516 U.S. 137, 143, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995)). The Court made clear that the facts set forth by the Government did not fall within the parameters of the language of the statute:

> It surely is not the common perception that a private, owner-occupied residence is "used" in the "activity" of receiving natural gas, a mortgage, or an insurance policy. *Cf. Bailey*, 516 U.S. at 145, 116 S.Ct. 501 (interpreting the word "use," as it appears in 18 U.S.C. § 924(c)(1), to mean active employment of a firearm and rejecting the Government's argument that a gun is "used" whenever its presence "protect[s] drugs" or "embolen[s] a drug dealer"). The Government does not allege that the Indiana residence involved in this case served as a home office or the locus of any commercial undertaking. The home's only "active employment," so far as the record

---

**3.** As discussed *infra,* RICO was also passed as part of the OCCA, in Title IX.

reveals, was for the everyday living of Jones's cousin and his family.

*Jones,* 120 S.Ct. at 1910.

The Court observed that if it were to adopt the Government's interpretation, that "hardly a building in the land would fall outside the federal statute's domain." *Id.* at 1911. "If such connections sufficed to trigger § 844(i), the statute's limiting language, 'used in' any commerce-affecting activity, would have no office." *Id.* The Court also reiterated the observations in *Lopez,* that the crime was one of "traditional state concern" and that "neither the actors nor their conduct has a commercial character." The Court also cautioned that, " 'unless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance' in the prosecution of crimes." *Id.* (quoting *United States v. Bass,* 404 U.S. 336, 349, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971)).

As the Government correctly points out, *Jones* was not a constitutional decision. It did not hold that the arson statute was unconstitutional as-applied under the circumstances, but rather that the arson statute, by its terms, did not apply to the factual circumstances before the Court. The Court relied on Commerce Clause cases to support its interpretation of what constitutes a building "used in" interstate commerce; it fell short, however, of holding the statute unconstitutional as-applied under "the interpretive rule that constitutionally doubtful constructions should be avoided where possible." *Jones,* 120 S.Ct. at 1908 (citing *Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council,* 485 U.S. 568, 575, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988))("[t]he elementary rule is that every reasonable construction must be resorted to, in order to save a statute from unconstitutionality." *Id.* (quoting *Hooper v. California,* 155 U.S. 648, 657, 15 S.Ct. 207, 39 L.Ed. 297 (1895))).

## B. RICO

### 1. Discussion of RICO on its Face

#### a. Legislative History

As the legislative backdrop of RICO makes clear, it was intended to curb organized crime aimed at corrupting legitimate business. On its face, the statute is aimed at economic enterprises, thus satisfying one of the central concerns of *Lopez* and *Morrison.* *See Morrison,* 120 S.Ct. at 1751; *Lopez,* 514 U.S. at 559–60, 115 S.Ct. 1624.

RICO was passed as Title IX of the Organized Crime Control Act ("OCCA") of 1970, Pub.L. 91–452, § 1102, 84 Stat. 952. The OCCA was designed to be a "potent criminal statute aimed at eradicating organized crime syndicates." S.Rep. 101–269 at 1.

At the time the statute was enacted, Congress published findings about the problems associated with organized crime:

> The Congress finds that (1) organized crime in the United States is a highly sophisticated, diversified, and widespread activity that annually drains billions of dollars from America's economy by unlawful conduct and the illegal use of force, fraud, and corruption; (2) organized crime derives a major portion of its power through money obtained from such illegal endeavors as syndicated gambling, loan sharking, the theft and fencing of property, the importation and distribution of narcotics and other dangerous drugs, and other forms of social exploitation; (3) this money and power are increasingly used to infiltrate and corrupt legitimate business and labor unions and to subvert and corrupt our democratic processes; (4) organized crime activities in the United States weaken the stability of the Nation's economic system, harm innocent investors and competing organizations, interfere

with free competition, seriously burden interstate and foreign commerce, threaten the domestic security, and undermine the general welfare of the Nation and its citizens; and (5) organized crime continues to grow because of defects in the evidence-gathering process of the law inhibiting the development of the legally admissible evidence necessary to bring criminal and other sanctions or remedies to bear on the unlawful activities of those engaged in organized crime and because the sanctions and remedies available to the Government are unnecessarily limited in scope and impact.

It is the purpose of this Act to seek the eradication of organized crime in the United States by strengthening the legal tools in the evidence-gathering process, by establishing new penal prohibitions, and by providing enhanced sanctions and new remedies to deal with the unlawful activities of those engaged in organized crime.

Statement of Findings and Purpose, P.L. No. 91–452, 84 Stat. 922–923 (1970).

RICO was aimed, in large part, at crimes which were economic in character. For example, the House Report of the original bill describes the economic nature of the crime:

> THIS TITLE CREATES A NEW CHAPTER IN TITLE 18, ENTITLED 'RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS,' WHICH CONTAINS A THREEFOLD STANDARD (1) MAKING UNLAWFUL THE RECEIPT OR USE OF INCOME FROM 'RACKETEERING ACTIVITY' OR ITS PROCEEDS BY A PRINCIPAL IN COMMISSION OF THE ACTIVITY TO ACQUIRE AN INTEREST IN OR ESTABLISH AN ENTERPRISE ENGAGED IN INTERSTATE COMMERCE; (2) PROHIBITING THE ACQUISITION OF ANY ENTERPRISE ENGAGED IN INTERSTATE COMMERCE THROUGH A 'PATTERN' OF 'RACKETEERING ACTIVITY,' AND (3) PROSCRIBING THE 'PATTERN' OR 'RACKETEERING ACTIVITY.'
> 'RACKETEERING ACTIVITY' IS DEFINED IN TERMS OF SPECIFIC STATE AND FEDERAL CRIMINAL STATUTES.

H.R.Rep. No. 1549, 91st Cong., 2nd Sess 1970, 1970 U.S.C.C.A.N. 4007.

"Racketeering activity" was originally defined to include "murder, kidnaping, gambling, arson, robbery, bribery, extortion, narcotic violations, counterfeiting, usury, mail, bankruptcy, wire and securities fraud, and obstruction of justice." *Id.* Most of the crimes listed are economic in character, or have an economic component. The legislative history notes that "racketeering activity" is one of three prerequisites to commission of an offense. "If there is no 'racketeering activity', or no collection of an 'unlawful debt' there can be no violation of the provisions of this Title." *Id.*

The legislative history of § 1962 of RICO, which makes racketeering activity unlawful, states:

> Section 1962 establishes a threefold *prohibition aimed at stopping the infiltration of racketeers into legitimate organizations.* Subsection (a) makes it unlawful to invest funds derived from a pattern of racketeering activity, as defined in section 1961(1) and (5), or collection of unlawful debt as defined in section 1961(6), in any enterprise engaged in interstate or foreign commerce.... Subsection (b) prohibits acquisition or maintenance of an enterprise through the proscribed pattern of racketeering activity or collection of unlawful debt.... Subsection (c) prohibits the conduct of the enterprise

through the prohibited pattern of activity or collection of debt. Subsection (d) makes conspiracy to violate (a), (b), or (c) equally subject to the sanctions [imposed for violating (a), (b), and/or (c) ].

H.R.Rep. No. 1549, 91st Cong., 2nd Sess 1970, 1970 U.S.C.C.A.N. 4007.

### b. Jurisdictional Element

That portion of the RICO statute at issue here, in its current form, contains a jurisdictional element which was absent in both *Lopez* and *Morrison.* The RICO statute reads: "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering or collection of unlawful debt." 18 U.S.C. § 1962(c).

The legislative history contains express congressional findings about the effects of organized crime on interstate commerce, which was another factor considered in *Morrison.* While these legislative findings, standing alone, would not "sustain the constitutionality of Commerce Clause legislation," *Morrison,* 120 S.Ct. at 1752, the findings, coupled with the jurisdictional element, allow for a case-by-case inquiry into the question of whether the prohibited conduct affects interstate commerce.[4] *Morrison,* 120 S.Ct. at 1751 ("Such a jurisdictional element may establish that the enactment is in pursuance of Congress' regulation of interstate commerce.") *see also Lopez,* 514 U.S. at 561, 115 S.Ct. 1624; *United States v. Bass,* 404 U.S. 336, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971); *United*

*States v. Torres,* 129 F.3d 710, 717 (2d Cir.1997); *United States v. Muyet,* 994 F.Supp. 501, 524 (S.D.N.Y.1998); *United States v. Riley,* 985 F.Supp. 405, 408–09 (S.D.N.Y.1997).

### c. Attenuation

Moreover, in both *Lopez* and *Morrison,* the Court found there was an attenuated link between the activity criminalized in the federal statute and the alleged effect on commerce. *See Morrison,* 120 S.Ct. at 1752–53; *Lopez,* 514 U.S. at 563–67, 115 S.Ct. 1624. This is not the case with RICO. Organized crime enterprises frequently cross state lines in the commission of their unlawful acts, and even if an enterprise does notcross state lines, the statute's prohibition of racketeering activity, as defined, encompasses numerous crimes that are economic in nature. *Lopez* and *Morrison* made clear that where activity is *economic in nature,* "the cases have upheld Commerce Clause regulation of [even] intrastate activity." *Morrison,* 120 S.Ct. at 1751; *Lopez,* 514 U.S. at 559–60, 115 S.Ct. 1624. Thus although the question is not at issue here, RICO would survive a facial constitutional challenge.

### B. As-applied Challenge

### 1. RICO and *Jones*

As discussed above, RICO makes it unlawful "for any person employed by or associated with any *enterprise engaged in, or the activities of which affect,* interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering or collection of unlaw-

---

4. In this regard the Court reminded us that, "[w]hether particular operations affect interstate commerce sufficiently to come under the constitutional power of Congress to regulate them is ultimately a judicial rather than a legislative question, and can be settled finally only by this Court." *Morrison,* 120 S.Ct. at 1752 (quoting *Heart of Atlanta Motel. Inc. v. United States,* 379 U.S. 241, 273, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964)(Black, J., concurring)).

ful debt." 18 U.S.C. § 1962(c)(emphasis added). The statute penalizes conduct which directs or conducts an "enterprise."[5] In order for federal jurisdiction to attach, the enterprise must be "engaged in interstate commerce," or its activities must affect interstate commerce.

As discussed *supra*, because of the wording of the statute in *Jones*, the Court focused on whether the damaged or destroyed building was "used in" commerce or in an "activity affecting" commerce. *Jones*, 120 S.Ct. at 1910. Here, based on the text of the RICO statute, the focus must be on the "enterprise" and its engagement in, or affect on, interstate commerce. *Lopez, Morrison,* and *Jones,* coupled with the Supreme Court's definition of "engaging in commerce," establish that economics are the lynchpin of the Commerce Clause. *Lopez*, 514 U.S. at 577, 115 S.Ct. 1624 ("Were the Federal Government to take over the regulation of entire areas of traditional state concern, areas having nothing to with the regulation of commercial activities, the boundaries between the spheres of federal and state authority would blur." *Id.*); *Morrison*, 120 S.Ct. at 1750 ("[I]n those cases where we have sustained federal regulation of intrastate activity based upon the activity's substantial effects on interstate commerce, the activity in question has been some sort of economic endeavor." *Id.*); *Jones*, 120 S.Ct. at 1911–12 (characterizing *Lopez* and stating that Congress' Commerce Clause power is limited where the area regulated is "one of traditional state concern, ... and ... the legislation is aimed at activity in which 'neither the actors nor their conduct has a commercial character.'" *Id.* (quoting *Lopez*, 514 U.S. at 580, 115 S.Ct. 1624)).

The Court in *Jones* relied upon the principles underlying its Commerce Clause jurisprudence in support of its interpretation of the federal arson statute. This Court also must keep those principles in mind in its interpretation of the RICO statute. *Jones*, 120 S.Ct. at 1911–12. As the following discussion will demonstrate, nothing in the indictment or the Government's arguments establishes that there was any economic component to the activities of the Cash Flow Posse, and the gang cannot be said to have "engaged in interstate commerce" within the meaning of RICO § 1962(c).

### a. "Engaged In ... Interstate or Foreign Commerce"

In *Jones*, the Court was faced with defining the substance of the term "used in" interstate commerce. The arson statute, § 844(i), makes it a federal crime to damage or destroy, "by means of fire or an explosive, any ... property *used in* interstate or foreign commerce or in any activity affecting interstate or foreign commerce." 18 U.S.C. § 844(i). Noting that when terms used in a statute are undefined they are to be given their plain meaning, the Court stated that the qualification "used in" "is most sensibly read to mean active employment for commercial purposes, and not merely a passive, passing, or past connection to commerce. Although 'variously defined,' the word 'use,' in legislation as in conversation, ordinarily signifies 'active employment.'" *Jones*, 120 S.Ct. at 1910 (quoting *Bailey v. United States*, 516 U.S. 137, 143, 145, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995)).

Similarly, the RICO statute does not

---

**5.** The act defines "enterprise" to include, "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

define the term "engaged in." [6] The United States Supreme Court defined the term in a post-*Lopez* RICO case, *United States v. Robertson*, 514 U.S. 669, 671, 115 S.Ct. 1732, 131 L.Ed.2d 714 (1995). In defining the term "engaged in" the Court borrowed from their definition of "engaged in commerce" as that phrase is used in § 7 of the Clayton Act. *See United States v. American Bldg. Maintenance Indus.*, 422 U.S. 271, 283–85, 95 S.Ct. 2150, 45 L.Ed.2d 177 (1975). The Court in *Robertson* stated that an entity is "generally 'engaged in commerce' when it is itself 'directly engaged in the production, distribution, or acquisition of goods or services in interstate commerce.'" *Robertson*, 514 U.S. at 672, 115 S.Ct. 1732 (quoting *American Bldg. Maintenance*, 422 U.S. at 283, 95 S.Ct. 2150). Thus, "engaged in" suggests active involvement.

Applying this definition, the *Robertson* Court concluded that the enterprise at issue there, a gold mine, had engaged in interstate or foreign commerce within the meaning of RICO § 1962(a). *Robertson* involved a partnership agreement to finance a gold mining operation in Alaska. There were numerous interstate commerce connections. The defendant, who resided in Arizona made payment of over $200,000 for placer gold mining claims near Fairbanks and for equipment and supplies related to the mine which were purchased in California and shipped to Alaska. The defendant hired numerous employees from outside Alaska to work at the mine, and the defendant personally transported gold out of the state. Thus, *Robertson* involved numerous interstate financial transactions, as well as the interstate movement of people and goods, for economic gains, or for commercial purposes. The Supreme Court determined that these activities "as-

suredly brought the gold mine within § 1962(a)'s alternative criterion of 'any enterprise ... engaged in ... interstate or foreign commerce.'" *Robertson*, 514 U.S. at 671–72, 115 S.Ct. 1732.

Here, the Cash Flow Posse cannot be said to have "engaged in interstate or foreign commerce." The Government's proffered ties to interstate commerce are weak, and they do not involve interstate financial transactions, or the interstate movement of people or goods for commercial purposes or economic gains. If the Court were to accept the Government's argument that the enterprise here engaged in interstate commerce because its members drove on I–94 within the state, because the members used a gun manufactured in another state, because the gun was purchased from a business that frequently has out-of-state customers, because the enterprise possibly had chapters in other states, and because two members of the enterprise discussed the case pending against them while on a trip to Mexico, the distinction between what is truly national and what is truly local would be obliterated. *Morrison; Jones; Lopez.* There would be little activity that would not constitute engaging in interstate commerce.

### i. Driving on an interstate highway within one state

■ If driving on an interstate highway between two cities, located in the same state, constitutes engaging in interstate commerce, then every driver who uses an interstate highway, to buy groceries, commute to work, or visit a friend just a few miles a way, engages in interstate commerce. Given the definition of "engage" set forth by the Court in *Robertson*, driving within one state on an interstate high-

---

**6.** In this context, engage connotes "to occupy or involve oneself; take part; be active." Webster's New World Dictionary 450 (3d ed.1988).

way cannot constitute "directly engag[ing] in the production, distribution, or acquisition of goods or services in interstate commerce." *Robertson*, 514 U.S. at 672, 115 S.Ct. 1732.

### ii. Use of a gun manufactured in another state

■ Neither does the use of a gun manufactured in another state constitute engaging in interstate commerce. Because there are no gun manufacturers in Michigan, virtually every gun comes from another state. Thus, any gun use in a state that does not manufacture guns necessarily involves the acquisition of a product that moved in interstate commerce. If the use of a gun manufactured in another state supplied the jurisdictional hook for whether an action constitutes "engaging" in interstate commerce, then every crime committed in Michigan with a gun, or any other weapon not manufactured here, would potentially be subject to federal criminal jurisdiction. This is not the law. If it were, then whether or not federal criminal jurisdiction attaches would depend upon where weapons are manufactured. The guns used here were the implements by which members carried out alleged criminal activity; the guns may have been involved in interstate commerce, but not the enterprise, as the statute requires.

The Supreme Court made clear in *American Building Maintenance*, that the purchase, from a local supplier, of goods which traveled at one time in interstate commerce does not constitute "engaging in" the "acquisition of goods in interstate commerce." The Court found that a janitorial services supplier could not be said to have "engaged in commerce" based on the allegation that the company made local purchases of equipment and supplies that were manufactured in another state.

*American Bldg. Maintenance*, 422 U.S. 271, 285, 95 S.Ct. 2150, 45 L.Ed.2d 177 (1975). The Court stated:

> [A]lthough the Benton companies used janitorial equipment and supplies manufactured in large part outside of California, they did not purchase them directly from suppliers located in other States. Rather, those products were purchased in intrastate transactions from local distributors. Once again, therefore, the Benton companies were separated from direct participation in interstate commerce by the pricing and other marketing decisions of independent intermediaries. By the time the Benton Companies purchased their janitorial supplies, the flow of commerce had ceased.

*Id.* (citations and footnote omitted).

The Court concluded that "since the Benton companies did not participate directly in the sale, purchase, or distribution of goods or services in interstate commerce, they were not 'engaged in commerce' with in the meaning of [the Act]." *Id.* at 285–86, 95 S.Ct. 2150. Similarly here, the gang was not engaged in the acquisition of goods in interstate commerce simply because it used weapons which at one time crossed state lines.

### iii. Use of a gun purchased from a business with out-of-state customers

■ Similarly, the mere fact that the Cash Flow Posse used a gun purchased from a business which regularly attracts out-of-state customers does not satisfy the "engaged in interstate commerce" requirement. It is not alleged that the members of the Cash Flow Posse traveled out of state to purchase weapons. Most stores or businesses at least occasionally have patrons from other states. If shopping at a venue that frequently attracts out-of-

state customers were to constitute engaging in interstate commerce, then the reach of federal jurisdiction would be virtually unlimited.

In *Rewis* v. *United States*, 401 U.S. 808, 91 S.Ct. 1056, 28 L.Ed.2d 493 (1971), the United States Supreme Court vacated the convictions of two individuals who were charged under the Travel Act, 18 U.S.C. § 1952, with operating a gambling establishment near the Georgia–Florida border. The Court of Appeals affirmed the convictions, holding that although the defendants themselves never crossed state lines, the gambling operation which they operated was frequented by out-of-state customers, thus satisfying the jurisdictional nexus. The Supreme Court disagreed. It decided that Congress did not intend for the Travel Act to extend "to criminal activity solely because that activity is at times patronized by persons from another state." *Rewis*, 401 U.S. at 811, 91 S.Ct. 1056. The Court relied upon the wording of the statute which prohibits interstate travel with the intent to carry out criminal activity. It noted that the legislative history of the Act suggests that it was "aimed primarily at organized crime and, more specifically, at persons who reside in one State while operating or managing illegal activities located in another." *Id.* The Court also recognized that

> [g]iven the ease with which citizens of our Nation are able to travel and the existence of many multi-state metropolitan areas, substantial amounts of criminal activity, traditionally subject to state regulation, are patronized by out-of-state customers. In such a context, Congress would certainly recognize that an expansive Travel Act would alter sensitive federal-state relationships, could overextend limited federal police resources, and might well produce situations in which the geographic origin of customers, a matter of happenstance,

would transform relatively minor state offenses into federal felonies.

*Id.* at 812, 91 S.Ct. 1056.

*Rewis* is significant here because (1) it involved economic crime, (2) it was the illegal gambling establishment itself which formed the basis for the illegal activity, and (3) the mere fact that the illegal establishment had out of state customers was held insufficient to fall within the Travel Act's proscriptions. Here, the alleged tie to commerce is weaker yet. The predicate acts involve non-economic crimes, and it is not alleged that the Cash Flow Posse operated the store allegedly frequented by out-of-state customers. The Cash Flow Posse simply shopped there. It is not the law that use of any item purchased at a place frequented by out-of-state customers constitutes engaging in "the production, distribution, or acquisition of goods or services in interstate commerce."

### iv. Chapters or sects in other states

 Likewise, the alleged existence of Cash Flow Posse chapters or sects in other states fails to satisfy the "engaged in interstate commerce" requirement. The mere existence of the other cells does not constitute "the production, distribution, or acquisition of goods or services in interstate commerce." The existence of other entities has nothing to do with active involvement in interstate commerce. As charged, the indictment alleges no connection or interaction at all between the members of the Cash Flow Posse and their alleged membership chapters in other states.

### v. Discussing pending charges while in another country

 The final alleged tie to interstate commerce needs little discussion. Having a conversation with codefendants about

charges pending against them in one state while on a trip to another state or country simply does not constitute involvement in "the production, distribution, or acquisition of goods or services in interstate commerce."

For all of the reasons discussed above, the gang cannot be said to have "engaged in" interstate commerce for RICO purposes. The Court must next consider whether the activities of the enterprise nonetheless "affected interstate commerce."

### b. "Activities of Which Affect" Interstate Commerce—De Minimis Test

While the "engaged in" prong of RICO connotes active or direct involvement in interstate commerce, the second prong of the test, whether the "activities of [the enterprise] affect" interstate commerce, connotes broader, indirect involvement. The question here becomes how indirect that involvement can constitutionally be.

In the RICO gold mine case, *United States v. Robertson*, 514 U.S. 669, 671, 115 S.Ct. 1732, 131 L.Ed.2d 714 (1995), the Court explained that the "affecting" commerce test was developed to define the scope of Congress' power over intrastate commercial activities which have a substantial interstate effect. The Court stated:

> Most of the parties' arguments ... were addressed to the question whether the activities of the gold mine "affected" interstate commerce. We have concluded we do not have to consider that point. The "affecting commerce" test was developed in our jurisprudence to define the extent of Congress' power over *purely intrastate commercial activities that nonetheless have substantial interstate effects. See, e.g., Wickard v. Fil-*

*burn*, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942).

*Robertson*, 514 U.S. at 671, 115 S.Ct. 1732 (emphasis added).

Because the Court in *Robertson* found that the gold mine "engaged in" interstate commerce under RICO, it avoided the question of whether the gold mine's activities met the requirement of the "affecting commerce" portion of the statute. The Court noted:

> Whether or not these activities met (and whether or not, to bring the gold mine within the 'affecting commerce' provision of RICO, they would have to meet) the requirement of *substantially affecting* interstate commerce, they assuredly brought the gold mine within § 1962(a)'s alternative criterion of 'any enterprise ... engaged in ... interstate or foreign commerce.'

*Id.* at 671–62, 115 S.Ct. 1732 (emphasis added).

The Court's parenthetical comment, that the activities may not have to meet the requirement of substantially affecting interstate commerce in order to fall under the statute, is likely a reference to the rule that, historically, statutes which contain jurisdictional elements have not been subject to the "substantial effects" commerce test. Rather, they have been held to require only a de minimis connection to interstate commerce. *United States v. Juvenile Male*, 118 F.3d 1344, 1348–49 (9th Cir.1997); *United States v. Beasley*, 72 F.3d 1518 (11th Cir.) *cert. denied sub. nom. James v. United States*, 518 U.S. 1027, 116 S.Ct. 2570, 135 L.Ed.2d 1086 (1996); *United States v. Robinson*, 763 F.2d 778, 781 (6th Cir.1985).

Although the Sixth Circuit has not, since *Lopez*, addressed whether the de minimis test survives with respect to RICO, it has held that the test still applies to the Hobbs Act, which, like RICO, contains a jurisdic-

tional element. *United States v. Smith,* 182 F.3d 452, 456 (6th Cir.1999), *cert. denied,* 530 U.S. 1206, 120 S.Ct. 2201, 147 L.Ed.2d 236 (2000); *see also United States v. Wall,* 92 F.3d 1444, 1450 n. 13 (6th Cir.1996), *cert. denied,* 519 U.S. 1059, 117 S.Ct. 690, 136 L.Ed.2d 613 (noting that statutes which contain jurisdictional elements require "a low threshold of proof of interstate relation."... *Id.*).

Even under the most generous interpretation of what it means for a connection to commerce to be de minimis, however, the Government cannot satisfy the jurisdictional nexus here. In the wake of the Supreme Court's recent jurisprudence, the Sixth Circuit, post-*Morrison,* has added teeth to the de minimis requirement. In *United States v. Wang,* 222 F.3d 234 (6th Cir.2000), the Sixth Circuit invalidated two counts of a defendant's conviction under the Hobbs' Act, holding that even under the de minimis test, the connections to interstate commerce were not sufficient. *Id.* at 240, n. 2. Although the Court of Appeals did not explicitly reject the de minimis test, the Court stated that the required showing "is of a different order" when the victim is a private citizen, rather than a business entity engaged in interstate commerce. *Id.* at 238.

The defendant in *Wang* was charged with robbery affecting interstate commerce in violation of 18 U.S.C. § 1951. The victims of the alleged robbery were Paul and Patricia Tsai, the owners of a Chinese restaurant in Cookeville, Tennessee which purchases meat and seafood from out-of-state suppliers twice per month. Wang and his accomplice robbed the Tsai's at gun point in their private residence of approximately $4,200, of which approximately $1,200 came from the restaurant. Following a bench trial, Wang was found guilty of, *inter alia,* robbery affecting interstate commerce.

The district court found that there was "no effect on interstate commerce beyond an absolute de minimis effect of $1,200." The Sixth Circuit began its analysis by recognizing that "a rather low threshold" is required to support a de minimis effect on commerce. *Wang,* 222 F.3d 234, 237. The Court also stated that "[t]he jurisprudential landscape has not much changed in the wake of *Lopez.*" *Id.* at 238; *United States v. Smith,* 182 F.3d 452, 456 (6th Cir.1999). The Court of Appeals explained that *Lopez* "recognized that the commerce power includes regulation of activities that are connected with a commercial transaction, which, viewed in the aggregate, substantially affects interstate commerce." *Wang,* 222 F.3d 234, 238 (citing *Lopez,* 514 U.S. at 561, 115 S.Ct. 1624). "On this basis, we decided that *Lopez* did not require realignment of the Hobbs Act's jurisdictional nexus because individual instances arising under the statute could, through repetition, have a substantial effect on interstate commerce." *Id.* For example, the Court explained that in *United States v. Smith,* the defendant's conviction under the Hobbs Act for the robbery of several Michigan party stores of sums in the low four figures was upheld because "[b]y proving that the stores Smith robbed did substantial business in beer, wine, and tobacco products, and that virtually none of such products originate in Michigan, the government met its burden." *Wang,* 222 F.3d 234, 238.

Turning to the case before it, and commenting on the breadth of its precedents in this area, the Court stated: "Even as broadly phrased as our precedents are, however, they do not compel the result that the district court reluctantly reached in this case." *Id.*

As with the overwhelming majority of cases involving the statute, our precedents have involved robberies in which

the victims were businesses engaged in interstate commerce. But where, as here, the criminal act is directed at a private citizen, the connection to interstate commerce is much more attenuated.

*Id.* (citing *United States v. Quigley*, 53 F.3d 909, 910 (8th Cir.1995))("Actions normally have a lesser effect on interstate commerce when directed at individuals rather than businesses."). In the context of determining the showing required for a robbery to have a "realistic probability of affecting interstate commerce," the Court held that "the required showing is of a different order than in cases in which the victim is a business entity." *Wang*, 222 F.3d 234, 238.

The Court cited several cases which recognize that the robbery of a private individual that "causes only a speculative indirect effect on a business engaged in interstate commerce will not satisfy the jurisdictional requirement of the Hobbs Act." *Id.* at 238–39; *See, e.g., United States v. Collins*, 40 F.3d 95, 100 (5th Cir.1994); *Quigley*, 53 F.3d at 910–11, *United States v. Mattson*, 671 F.2d 1020, 1024–25 (7th Cir.1982). The Court observed:

> The Hobbs Act's de minimis standard survives *Lopez* by virtue of the aggregation principle. But the *Lopez* Court declined to apply the aggregation principle in conjunction with long chains of causal inference that would have been necessary to arrive at a substantial effect on interstate commerce.... Just this sort of "butterfly effect" theory of causation would be required to find liability in the great majority of Hobbs Act cases in which the victim is a private citizen.... Per *Lopez*, a small sum stolen from a private individual does not, through aggregation, affect interstate commerce merely because the individual happens

to be an employee of a national company, or happens to be on his way to a store, or happens to be carrying proceeds from a restaurant.

*Wang*, 222 F.3d 234, 238–39 (internal citations and footnote omitted).

The Court made clear that a *substantial effect* on commerce must be shown where the Government seeks to satisfy the Hobbs Act's jurisdictional nexus by showing a connection between an individual victim and a business engaged in interstate commerce. *Id.* at 240 The Court opined that the showing may be made by "demonstrating that the defendant knew of or was motivated by the individual victim's connection to interstate commerce." *Id.* (citing *United States v. Mills*, 204 F.3d 669, 670 (6th Cir.2000)). The Court anticipated, however, that the "overwhelming majority of Hobbs Act cases brought before the federal courts will continue to be ones in which the victims are businesses directly engaged in interstate commerce." *Wang*, 222 F.3d 234, 240.

The Court concluded that because Wang robbed private citizens in their private home of $4,200, only $1,200 of which belonged to the restaurant with ties to commerce, and the government had not shown "a substantial connection between the robbery and the restaurant's business", to affirm his conviction would amount to recognition of a "general federal police power with respect to crimes of robbery and extortion." *Id.* Citing to the holding of *Morrison*, the Court stated that due regard for its principles required that Wang be tried in state court. *Id.* at 240–41.

The principles announced in *Wang* concerning the post-*Lopez*/*Morrison* application of the de minimis test apply with equal force to this case. The de minimis test survives, as explained in *Wang*, because of the aggregation principle. However, this does not mean that the required

jurisdictional element can be established by layering inference upon inference. Thus, while the Court in *Wang* observed that the de minimis test is still applicable, it declined to apply it to the robbery of a private individual because its connection to interstate commerce was attenuated. *Wang* suggests that the de minimis test will apply where the crime charged is aimed at a business engaged in interstate commerce, but not where the victim is a private individual and the link between the criminal activity and interstate commerce is weak.

Similarly here, although the de minimis test may survive for RICO purposes, it cannot be applied in a way that would require the Court to pile inferences together to reach the required jurisdictional nexus. *Wang*, 222 F.3d 234, 238–39 (citing *Lopez*, 514 U.S. at 567, 115 S.Ct. 1624). The cases make clear that aggregation has limits, and *Wang* suggests that in the wake of *Lopez*, and *Morrison*, it is not appropriate to apply the de minimis test in a manner which would give the test no meaning. *Wang*, 222 F.3d 234, 240–41. Therefore, it is questionable whether it remains appropriate for the Court to apply the de minimis test to the criminal activity alleged here; gang members committing intrastate acts of murder and assault where the gang's alleged connection to interstate commerce is highly attenuated

and supported solely by layers of inference.[7]

Even construing the jurisdictional element as broadly as possible, the de minimis test cannot, in light of *Morrison, Jones,* and *Wang*, justify the exercise of federal jurisdiction over this case.[8] These cases make explicit what *Lopez* first suggested, that economics are the lynchpin of the Commerce Clause jurisprudence. If the de minimis test survives at all, it survives because of the aggregation principle, and the notion that individual instances of conduct could, through repetition, *substantially* affect interstate commerce. *Wang*, 222 F.3d 234, 238–39. Repetition of the conduct and connections to commerce alleged here cannot create a substantial effect on interstate commerce. Nor can the aggregate effects of non-economic, purely local, violent criminal conduct justify federal jurisdiction. *Morrison*, 120 S.Ct. at 1754.

### i. Guns

▬▬ The Government attempts to justify the reach of the RICO statute by arguing by analogy to the jurisdiction required to sustain a charge of the federal felon in possession statute, 18 U.S.C. § 922(g). The Government argues: "the nexus to commerce in the instant case is at least as great as that sufficient to sustain prosecutions under the felon in possession

---

**7.** The Court is mindful that it is the enterprise's effect on commerce that is important for RICO purposes, and not the enterprise's predicate acts. However, the Court cannot ignore that RICO's intent was not to federalize murder and assault aimed at private citizens, but rather to curb the corruption of legitimate businesses by organized criminal groups. RICO lists murder as a predicate offense, but there is nothing economic about that crime itself—it must be part of a pattern of racketeering activity. If the Court were to find the jurisdictional nexus satisfied in these circumstances, it would amount to a federalization of crimes traditionally prosecuted by

the states which have no economic component at all. This would clearly violate the underlying principles set forth in *Morrison* and *Jones*.

**8.** Although this Court previously held that the Government had met its burden with respect to the de minimis connection to interstate commerce required under RICO, *see United States v. Garcia*, 68 F.Supp.2d 802, 811 (E.D.Mich.1999), the intervening decisions of *Morrison, Jones,* and *Wang*, require a different outcome.

statute." Gov't Resp. Br. at 15. After noting that they are prepared to prove that the enterprise's activity "included not just the possession, but the use, of one or more firearms that had traveled in interstate commerce", the Government states, "[b]ecause the commission of violence with firearms was such an important part of this enterprise's reason for being, the use of the RICO statute to reach such conduct is constitutional." *Id.*

First of all, this Court need not decide in this case what ties to interstate commerce may be required to sustain federal jurisdiction under the felon in possession statute, as none of the gang members are charged with that violation.

 Even if it were at issue, what may be required to satisfy the jurisdictional nexus of one statute is not transmittable to satisfy the jurisdictional nexus of another. The fact that Congress may regulate the weapons used or possessed by individuals under one regulatory scheme does not mean that use of those weapons may be used to satisfy the jurisdictional requirement of another statute (here RICO) which is not predicated on the ability of Congress to regulate the use or possession of weapons. Congressional power to regulate firearms does not establish that any use of firearms can tie an enterprise to interstate commerce for RICO purposes.

Finally, cases applying the de minimis test have stressed that it is how the activity is tied to economics, rather than how the activity is tied to guns or firearms, that is important for Commerce Clause purposes. For example, in *Wang*, the Sixth Circuit mentioned in its recitation of the facts that Wang and his accomplice both had guns with which they threatened their victims during the commission of the rob-

bery. However, the use of firearms in that case did not justify federal jurisdiction under the statute. In fact, during its jurisdictional analysis, the *Wang* Court did not even address the fact that guns were used in the commission of the crime.

Another case which is factually similar demonstrates why the Cash Flow Posse's use of guns is insufficient to constitute a de minimis effect on commerce. In *United States v. Juvenile Male*, 118 F.3d 1344, 1349–50 (9th Cir.1997) the Ninth Circuit found the de minimis test to be satisfied. The enterprise in question was a street gang known as the "Rolling 30s" which, because of conflicts with other gangs, "implemented a plan to commit armed robberies as a way of acquiring money with which to purchase additional firearms." *Id.* at 1346. In furtherance of their plan, some gang members robbed a Subway restaurant and murdered the Subway employee. As a result of the crime, the restaurant was forced to close down for several days and was forced to hire new employees. *Id.* at 1349. The robbery was committed for the purpose of obtaining additional firearms.[9]

Considering whether the gang's activities had a de minimis effect on commerce, the Court stated that "the jurisdictional requirement is satisfied by proof of probable or potential impact." *Id.* at 1349. The Court found that the gang's activities had a probable or potential impact on interstate commerce in that (1) the defendants robbed a Subway franchise which sends some of its profits to its headquarters in another state; (2) the money stolen and the sandwiches and chips stolen were purchased from out-of-state suppliers; (3) the store was forced to close down after the incident and to hire all new employees; (4) the firearm used during the robbery

---

**9.** The gang members were also allegedly involved in a series of other crimes, including arson, assault, robbery and murder. *Juvenile Male*, 118 F.3d at 1346.

moved in interstate commerce, and "the purpose of the robbery was to obtain additional firearms (which has a potential impact on interstate commerce)." *Id.*

The Court found the de minimis test to be satisfied based on all of the enumerated ties listed above. It did not rely upon the firearm used in interstate commerce, standing alone, to justify the statute's application, nor did it rely on the Rolling 30's conflicts with other gangs. There were economic components to the crime. Not only did the crime alleged involve a robbery, but also it involved a business engaged in interstate commerce as its direct victim.

Furthermore, in *Juvenile Male*, one of the purposes of the gang was to steal money to obtain more firearms. *Id.* at 1346. The purpose of the Cash Flow Posse was not to commit crimes to earn money to buy guns; but rather to commit crimes to protect their turf. The Cash Flow Posse used guns as a tool of their

trade; they did not commit crimes aimed at securing more firearms.[10]

### ii. The Gang's Resistance

■ The Government also theorizes that the Cash Flow Posse's resistance to out-of-state gang infiltration constitutes an activity affecting interstate commerce because these out-of-state gangs sought to obtain members who would engage in drug-trafficking in Detroit. The Government asserts that it is prepared to prove that the Cobras and the Counts affected interstate commerce in that *they* were involved in drug trafficking and that these gangs came to southwest Detroit for the purpose of establishing drug trafficking in Michigan. The Government contends that because the Cash Flow Posse resisted these efforts, the Cash Flow Posse affected interstate commerce. This Court disagrees. At best, the Government's evidence may show that the Cash Flow Posse stopped interstate commerce from occurring, i.e. by keeping the rival gangs and their drug trafficking activities out.

10. The Government also relies upon *United States v. Bass*, 404 U.S. 336, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971), which involved an interpretation of the "in commerce or affecting commerce" element of the predecessor version of the felon in possession of firearms statute. As the Court in *Lopez* explained, the *Bass* Court "interpreted the statute to reserve the constitutional question whether Congress could regulate, without more, the 'mere possession' of firearms." *Lopez*, 514 U.S. at 562, 115 S.Ct. 1624 (citing *Bass*, 404 U.S. at 339, n. 4, 92 S.Ct. 515). *Bass* held that the Government must prove, as an essential element of the offense, that a possession, receipt, or transportation of a firearm was "in commerce or affecting commerce." *Bass*, 404 U.S. at 347, 92 S.Ct. 515. The Court did so with two underlying principles in mind; the first being that "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity", *id.* (citing *Rewis v. United States*, 401 U.S. 808, 812, 91 S.Ct. 1056, 28 L.Ed.2d 493 (1971)), and the second being that "unless Congress conveys its purpose clearly, it will

not be deemed to have significantly changed the federal-state balance. Congress has traditionally been reluctant to define as a federal crime conduct readily denounced as criminal by the States." *Bass*, 404 U.S. at 349, 92 S.Ct. 515 (footnotes omitted). The principles announced in *Bass* support the analysis here.

To the extent that *Bass* suggests that the nexus to commerce need only be minimal in order to support the "in commerce or affecting commerce" element which it found to be an essential element of the crime, the language constitutes dicta. *See id.*, 404 U.S. at 350–51, 92 S.Ct. 515. To the extent that the discussion of the minimal connection required may constitute an essential part of the Court holding in *Bass*, is must be remembered that *Bass* is a 1971 decision and *Lopez* did not cite *Bass* for this proposition, rather, it recognized that *Bass* did not reach the constitutional question of "whether Congress could regulate, without more, the mere possession of firearms." *Lopez*, 514 U.S. at 562, 115 S.Ct. 1624.

In support of its argument, the Government relies on *National Org. for Women, Inc. v. Scheidler,* 510 U.S. 249, 256–261, 114 S.Ct. 798, 127 L.Ed.2d 99 (1994), wherein the Supreme Court held that RICO does not require proof of an economic motive. This Court is not holding that an economic motive is required. Rather, as *Robertson* suggests, the gang's activities must somehow be commercial in nature, or have some economic effect.

*Scheidler* was a civil RICO case brought against abortion protesters alleged, *inter alia,* to have been "members of a nationwide conspiracy to shut down abortion clinics through a pattern of racketeering activity." *Id.* at 253, 114 S.Ct. 798. Discussing the language of the RICO statute, the Supreme Court observed that "[a]rguably an enterprise engaged in interstate or foreign commerce would have a profit-seeking motive, but the language in § 1962(c) does not stop there; it includes enterprises whose activities 'affect' interstate or foreign commerce." *Id.* at 257–58, 114 S.Ct. 798. The Court defined "affect" as "to have a detrimental influence on—used especially in the phrase affecting commerce." *Id.* at 258, 114 S.Ct. 798. "An enterprise surely can have a detrimental influence on interstate or foreign commerce without having its own profit-seeking motives." *Id.* Rejecting the argument that an economic motive is required, the Court stated: "[r]espondents and the two Courts of Appeals, we think, overlook the fact that predicate acts, such as the alleged extortion, may not benefit the protesters financially but still may drain money from the economy by harming businesses such as the clinics which are petitioners in this case." *Id.* at 260, 114 S.Ct. 798.

Nothing in *Scheidler* requires a finding of federal jurisdiction here. The Court was not considering there the sufficiency of jurisdiction under the RICO statute. The Court's holding, that the RICO statute does not require proof of an economic motive, reinforces the analysis here. If *Scheidler* stands for anything applicable in this context, it suggests that the reach of the statute was permissible there because the predicate acts "such as the alleged extortion" may "drain money from the economy by harming businesses such as the clinics . . . in this case." *Id.* at 260, 114 S.Ct. 798. *Scheidler* recognized that predicate acts can have an adverse effect on interstate commerce because of their commercial nature. As discussed, none of the predicate acts alleged in the indictment here have a commercial or economic component.[11]

Further, the suggestion that the Government can prove that the Cash Flow Posse affected commerce by preventing the rival gangs from establishing drug trafficking in southwest Detroit would require the Court to cobble together a series of inferences in order to find that the jurisdictional nexus is satisfied. The Government's argument links together like this: (1) the Cash Flow Posse formed to resist the infiltration of rival gangs; (2) the rival gangs were allegedly engaged in drug trafficking; (3) the rival gangs were attempting to recruit individuals (who eventually became Cash Flow Posse members) to conduct drug trafficking in southwest Detroit; (4) drug trafficking is an activity which affects interstate commerce; thus (5) the Cash Flow Posse's resistance of the rival gang's efforts to establish drug

---

**11.** It is spurious to suggest that the Cash Flow Posse's resistance of drug trafficking is an activity which affects interstate commerce. Surely the Government is not advocating the position that hindering drug trafficking is an activity that satisfies the jurisdictional element. If so, than all police activity would so qualify.

trafficking in Detroit was an activity affecting interstate commerce. The de minimis test cannot be constitutionally applied in such a manner. *See Wang*, at 240, n. 2; *Lopez*, 514 U.S. at 567, 115 S.Ct. 1624.[12]

### iii. Victims

 In applying the de minimis test, both *Wang* and *Juvenile Male* considered the impact of the alleged crime on the victims. *Wang*, 222 F.3d 234, 238–39; *Juvenile Male*, 118 F.3d at 1349. In *Juvenile Male*, the Court explained that although it is ultimately the enterprise's activities which must affect interstate commerce, one should not "overlook[ ] the possibility that the activities may affect interstate commerce by impacting the victim." The Court stated that "[w]e conclude that a district court may look at both the enterprise's activities and its impact on the victim to determine whether the interstate commerce nexus is satisfied." *Id.* at 1349–50. Thus, because the Subway involved in that case was a business directly engaged in interstate commerce, the jurisdictional nexus was satisfied under RICO.

In this case, some of the Cash Flow Posse's victims were rival gang members, and the Government has alleged that those rival gang members were engaged in drug trafficking. Likening the rival gangs' involvement in drug trafficking to the Subway restaurant in *Juvenile Male*, the Government argues that the Cash Flow Posse's activity affected interstate commerce by impacting its victims.

This impact on commerce is highly attenuated. The harm here was not aimed at terrorizing legitimate businesses with legitimate profits, as is the central aim of the RICO statute. *See supra* Part B.1.a. The crime may have caused rival thugs to make less money in drug trafficking, but it did not cause a legitimate business to close and be forced to hire new employees.

Further, *Wang* specifically rejected application of the de minimis test in a way that would require several steps between the criminal activity and the victim's connection to commerce. *Wang*, 222 F.3d 234, 238–39. "Per *Lopez*, a small sum stolen from a private individual does not, through aggregation, affect interstate commerce merely because the individual happens to be an employee of a national company, or happens to be on his way to a store, or happens to be carrying proceeds from a restaurant." *Id.* Similarly, violence committed against an individual because the individual happens to be a member of a national gang, or happens to be on his way to a drug transaction, or happens to be carrying proceeds from drug sales, does not through aggregation affect interstate commerce.

Given the recent precedent, this Court is not convinced that the jurisdictional nexus requirement of the RICO statute may be satisfied by focusing solely upon the effect an enterprise's activities may have on victims. *Morrison* rejected Congressional findings regarding the serious impact that gender-motivated violence has on victims and their families because "[t]he reasoning

---

12. That is not to suggest that it would never be appropriate for RICO to be used as a vehicle for prosecuting a gang or enterprise for acts of murder directed at private citizens. *See, e.g., Wang*, at 240. It may be appropriate, for example, in a situation where the enterprise in question is "engaged" in interstate commerce as defined by RICO, or where its activities affect interstate commerce in some economic way. Neither is the case here. There is simply nothing alleged in the indictment which suggests that the Cash Flow Posse is commercial in character, or that any of its activities affected interstate commerce in an economic manner. Prosecution of the type of intrastate violent crime alleged must be left to the state. *Morrison*, 120 S.Ct. at 1754.

that petitioners advance seeks to follow the but-for causal chain from the initial occurrence of violent crime (the suppression of which has always been the prime object of the States' police power) to every attenuated effect upon interstate commerce." *Morrison* recognized that

> If accepted, petitioners' reasoning would allow Congress to regulate any crime as long as the nationwide, aggregated impact of that crime has a substantial effect on employment, production, transit, or consumption. Indeed, if Congress may regulate gender-motivated violence, it would be able to regulate murder or any other type of violence since gender-motivated violence, as a subset of all violent crime, is certain to have lesser economic impacts than the larger class of which it is a part.

*Id.* at 1752–53.

Purchasing guns, driving on I–94, and responding to rival gang infiltration may have some attenuated relationship to the alleged acts of murder, but it cannot be concluded that they are effects of commercial activity or that they could, in the aggregate, constitute substantial effects on commercial activity.

## V. Conclusion

The acts alleged in the indictment are reprehensible crimes committed by violent individuals who should be severely punished. Recent precedent in the Supreme Court and the Sixth Circuit emphasize that the prosecution and punishment for these crimes must be undertaken by the States, however, and that the federal government exceeds its jurisdiction when it steps in this manner into the arena of local non-economic violent crime.

Being fully advised in the premises, having read the pleadings, and for the reasons set forth above, the Court hereby orders as follows:

Defendant's motion for rehearing and to dismiss the Third Superceding Indictment is GRANTED.

IT IS FURTHER ORDERED THAT the Third Superceding Indictment is DISMISSED.

SO ORDERED..